**In re PT–1 Communications, Inc., Debtor.**

**No. 01–12655.**

United States Bankruptcy Court, E.D. New York.

Feb. 4, 2004.

Angel & Frankel, P.C., by Lawrence May, Rochelle R. Weisburg, New York City, for Debtor.

McCarter & English, LLP, by Patricia Mullon Zohn, Newark, NJ, for Creditors' Committee.

Hughes, Hubbard & Reed, LLP, by Andrea Hazzard, New York City, for Spano Claimants.

Department of Justice, by Linda Riffkin, New York City, Office of the U.S. Trustee.

## MEMORANDUM DECISION ON DEBTORS' MOTION FOR AN ORDER SUBORDINATING OR EXPUNGING THE CLAIMS OF PETER SPANO, CAROLYN GUGLIELMO AND TERESA D'AVANZO

CONRAD B. DUBERSTEIN, Chief Judge.

This matter is before the Court on the Motion by PT–1 Communications, Inc. ("PT–1"), PT–1 Long Distance, Inc. ("Long Distance") and PT–1 Technologies, Inc. ("Technologies") (the "Debtors") for an order subordinating or expunging the claim of Peter Spano, Carolyn Guglielmo and Teresa D'Avanzo (the "Spano Claimants"). The Debtors are seeking relief under section 510(b) of title 11 of the United States Code (the "Bankruptcy Code") that the Spano Claim should be subordinated to the claims of general unsecured creditors, or in the alternative, that the Spano Claim should be expunged under principals of *res judicata* and collateral estoppel. For the reasons set forth below, the Motion is hereby granted in part and denied in part, to the extent that the Spano Claim is subordinated to the class of general unsecured creditors.

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

## II. Facts

### A. Procedural Background

The Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Court for the Eastern District of New York (the "Court") on March 9, 2001 (the "Petition Date"). The Debtors have been authorized to remain in possession of their respective property and to continue in the operation and management of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On or about March 23, 2001 the Official Committee of Unsecured Creditors (the "Committee") was appointed by the Office of the United States Trustee (the "U.S. Trustee").

### B. Corporate Structure of the Debtors

PT–1 is the parent company of a group of corporations in the telecommunications business that operate as facilities-based providers of long distance "dial around" telecommunications services. As of the Petition Date, PT–1 was a wholly owned subsidiary of Star Telecommunications, Inc. ("Star") which, along with certain other Star subsidiaries, has a separate chapter 11 case pending in the United States Bankruptcy Court for the District of Delaware.

On or about February 4, 1999 Star, through a newly-formed wholly-owned subsidiary, purchased the stock of PT–1 from PT–1's shareholders in exchange for Star stock and cash. The then existing PT–1 entity ("Old PT–1") was merged into the acquiring entity which was renamed PT–1 Communications, Inc.

### C. The Disputed Claim

The Spano Claimants filed a general unsecured proof of claim dated September

29, 2001 in the amount of $129,090,000 (the "Spano Claim"). Prior to the Petition Date, on September 28, 1998, the Spano Claimants brought an action in the Supreme Court of the State of New York, Richmond County against PT–1 and its former president, Samir Tawfik ("Tawfik") alleging breach of contract, breach of fiduciary duty and unjust enrichment as to Tawfik, and tortious interference with contract, participation in a breach of fiduciary duty and unjust enrichment as to PT–1.

The Spano Claimants asserted that they were the founders and original sixty percent (60%) owners of Old PT–1 along with Tawfik, and that they were wrongfully deprived of their ownership interest when Tawfik agreed to sell and did sell PT–1 to Star. They alleged that Tawfik breached an oral contract to create the company, and breached the fiduciary duties he owed them as a fellow shareholder in a close corporation. They also alleged that PT–1, in agreeing to and participating in the sale to Star, tortiously interfered with their contract with Tawfik and participated in the breach of his fiduciary duty. The Spano Claimants attached the state court complaint to their proof of claim in the bankruptcy case as the basis for their claim.

After the Petition Date, on or about April 10, 2001, the Spano Claimants filed a motion for relief from the automatic stay pursuant to section 362 of the Bankruptcy Code in order to proceed with the state action against PT–1. After a hearing on October 25, 2001, the Court denied that motion without prejudice. Since the automatic stay did not preclude the Spano Claimants from pursuing its state court action against Tawfik, they commenced a jury trial solely against him as PT–1's former president on June 11, 2002. The trial was bifurcated as to liability and damages.

At the completion of the liability phase, the jury rendered a unanimous verdict as to liability, finding for the Spano Claimants and against Tawfik on all counts, and specifically finding that (1) Tawfik had agreed that he and the Spano Claimants would form, own and operate PT–1; (2) that Tawfik breached that agreement; (3) that the Spano Claimants and Tawfik were co-owners of PT–1; and (4) that Tawfik had breached his fiduciary duty to the Spano Claimants. Recovery in the state court action was limited to $24,000. The Spano Claimants made a timely notice of appeal of the damages portion of the decision. The matter of damages is currently on appeal to the Supreme Court of New York, Appellate Division, Second Department.

What is left to be resolved in this Court is the future of the Spano Claim as against the Debtors, and whether the Claim should be subordinated, expunged, or allowed as a general unsecured claim.

## III. Discussion

### A. Overview

The Debtors argue that the Spano Claim should be expunged based on principles of *res judicata* and collateral estoppel as a result of the verdict against Tawfik in state court. In the alternative, the Debtors and the Committee assert that the Spano Claim should be subordinated to general unsecured claims pursuant to section 510(b) of the Bankruptcy Code. They argue that the Spano Claim is based on an action for damages arising from the purchase or sale of securities, namely an equity interest in PT–1, and that the Bankruptcy Code and the absolute priority rule mandate that the claim not share with other general unsecured creditors.

The Spano Claimants argue that neither the principals of *res judicata* nor collateral estoppel control in this instance. They

maintain that because the parties in the state court action were different, the *res judicata* argument is misplaced, and that since they did not have a full and fair opportunity to litigate their claims against the Debtors, the collateral estoppel argument must be ignored as well.

Alternatively, the Spano Claimants argue that subordination under section 510(b) is improper here because the claim does not constitute a claim arising from the purchase or sale of a security, but instead is based solely on the tortious conduct of PT–1.

### B. Res Judicata

■ *Res judicata*, or claim preclusion, exists to prevent a subsequent suit between the same parties where a prior action has been decided on the merits of the same cause of action. *See Tucker v. Arthur Andersen & Co.*, 646 F.2d 721, 726–27 (2d Cir.1981). It is well established that the doctrine will apply to preclude a later litigation if (1) the earlier decision was final; (2) on the merits; (3) by a court of competent jurisdiction; (4) in a case involving the same parties; and (5) involving the same cause of action. *See Teltronics Services, Inc., v. Hessen, et al.*, 762 F.2d 185, 190 (2d Cir.1985).

■ The principles of *res judicata* are not applicable here. The decision in the state court was made solely against Tawfik. The state court action against the Debtors was stayed by the filing of the bankruptcy petition, and the Debtors were not a party to the action that proceeded against Tawfik. Since the requirement of identity of the parties is not satisfied, the argument for the application of *res judicata* must be denied here.

### C. Collateral Estoppel

■ In order to apply the doctrine of collateral estoppel to bar litigation of a particular issue in subsequent proceedings, a four-part test must be satisfied. A claim can be dismissed if (1) the issues to be decided are identical; (2) the issue was actually litigated and decided in the prior proceeding; (3) there was a full and fair opportunity to litigate in the prior proceeding; and (4) the issue previously litigated was necessary to support the final judgment on the merits. *See Levy v. Kosher Overseers Ass'n,* 104 F.3d 38, 41 (2d Cir.1997).

■ The only factor that is in dispute in the present case is whether or not the Spano Claimants had a full and fair opportunity to litigate the issues in the state court action. The Spano Claimants argue that because the state court action is currently on appeal and that appeal will be reviewed de novo, the state court judge's decision has no collateral estoppel effect. While this may be so, it is not the decisive factor in determining whether to give the state court judgment collateral estoppel effect. What is decisive is that issues would arise in an action against PT–1 that would be separate and distinct from the action against Tawfik. This precludes any finding that the state court action has any collateral estoppel effect.

To illustrate, although the state court found Tawfik liable to the Spano Claimants, this Court believes that certain issues would arise in an action against the Debtors that may not have been addressed in the action against Tawfik. While the Debtors argue that the action against Tawfik stemmed from the identical set of facts as the stayed action against the Debtors and that the issues surrounding both have been fully litigated and disposed of, it is not readily apparent that this is the case. It is certainly possible that legal issues would arise in a trial against the Debtors that would surpass and differ from the

allegations contained in the complaint against Tawfik.

■ While the Debtors argue that the Spano Claimants' claims against the Debtors are derivative of the causes of action asserted against Tawfik, there are elements of the causes of action asserted against the Debtor that were not addressed in the state court action against Tawfik. For example, the Spano Claimants alleged breach of contract against Tawfik, which they were successful in proving. However, against the Debtors they asserted a claim for tortious interference with contractual relations, which is rooted in New York State common law and requires proof of different elements than simple breach of contract.[1] The Spano Claimants would have the burden of proving those additional elements, since they had not raised or proved them in the action against Tawfik.

It would thus be improper to give collateral estoppel effect to a state court judgment on appeal in which the causes of action were different, additional issues were not disposed of and the parties were not the same. For those reasons, the Spano Claimants are not barred by collateral estoppel from the state court action and this Court may properly consider their claim at this time.

## D. Subordination and Section 510(b) of the Bankruptcy Code

This Court is faced with a more difficult decision whether or not to apply section 510(b) of the Bankruptcy Code in this case and subordinate the Spano Claimants' claim as the Debtors urge in their motion.

### 1. Text of Section 510(b)

Section 510(b) of the Bankruptcy Code provides:

"For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, *for damages arising from the purchase or sale of such security,* or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal to the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock." 11 U.S.C. § 510(b) (2000) (emphasis added)

The key to determining whether the Spano Claim can be properly subordinated is whether the claim is "for damages arising from the purchase or sale of a security." Not unlike many other statutes however, this language is ambiguous, especially when confronted with the facts of the present case.

■ Ambiguity exists when language in a statute can be reasonably interpreted by well-informed persons in more than one way. *See In re Geneva Steel Co.,* 281 F.3d 1173, 1178 (10th Cir.2002)(interpreting section 510(b) in light of legislative history). It is fair to say in the case at bar that counsel for both the Debtors and the Spano Claimants are well-informed, established attorneys who view the situation in conflicting ways. Thus, it is the job of this Court to come to a decision as to which view is best reflective of the language,

---

**1.** Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom. *See Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996).

scope, and policies considered by Congress in enacting section 510(b).

### 2. *The Debtors' and Committee's Argument*

The Debtors and the Committee argue that the Spano Claim is one rooted in a purported equity ownership in the Debtor, and therefore, the claim should not share *pari passu* in a possible distribution with unsecured creditors because it falls squarely within the language of section 510(b). They note that courts have generally interpreted the language of section 510(b) broadly and argue that this claim, while veiled in contract and tort causes of action, is at its core one to recover damages stemming from the denial of the Spano Claimants' equity interest in the enterprise. It should thus be characterized as a claim "arising from" a securities transaction and be subordinated.

### 3. *The Spano Claimants' Argument*

Alternatively, the Spano Claimants argue that their claim is not based upon a purchase or sale of a security, but arises out of the tortious conduct by the Debtors. They assert that there must be a "nexus of causal relationship" between the claim and a sale of securities in order for subordination to be proper and that in this case, there was no such nexus, since the claim is rooted in tortious interference with contractual relations. Essentially they say that their claim is based on the damages incurred after they and Tawfik created PT–1 and results from PT–1 aiding and abetting Tawfik in breaching the contract and the fiduciary duties owed them pursuant to the contract.

This creates a novel situation and question of law. Here, the Spano Claimants allege that they had an equity ownership interest in the Debtors, that they were wrongfully deprived of that ownership interest in 1995, but that the alleged damages supporting their claim should not be considered "damages arising from the purchase or sale of a security." The issue to be resolved now is whether this claim, which does not directly result from any literal securities transaction between the Debtors and the Spano Claimants and does not involve any tangible "shares," can properly fit into the framework of section 510(b) for subordination purposes.

### 4. *Generally*

■ The general rule is that "equity prefers the claims of innocent general creditors over the claims of shareholders or subordinated creditors deceived by officers of the corporation." *See In re Stirling Homex,* 579 F.2d 206, 213 (2d Cir. 1978). A number of decisions in the Second Circuit and elsewhere dealing with subordination under section 510(b) deal with the subordination of claims arising from fraud by the officers of the corporation or the corporation itself in the context of a securities transaction. *See generally In re Granite Partners,* 208 B.R. 332 (Bankr.S.D.N.Y.1997)(holding that claims that the debtor fraudulently induced the claimants to retain the debtor's securities after their purchase arose from the purchase or sale of those securities); *In re Amarex, Inc.,* 53 B.R. 888 (Bankr. W.D.Okla.1985), *rev'd on other grounds,* 78 B.R. 605 (W.D.Okla.1987)(subordinating class action claim for fraud).

■ Although many subordination cases sound in fraud, the scope of section 510(b) has been broadened over the years to include claims based on contract law and other actions. *See In re Telegroup, Inc.,* 281 F.3d 133 (3d Cir.2002)(breach of contract to use best efforts to register stock); *In re Betacom of Phoenix, Inc.,* 240 F.3d 823 (9th Cir.2001)(breach of contract); *In re International Wireless Communica-*

*tions Holdings, Inc.*, 279 B.R. 463 (D.Del. 2002) (breach of contract). This would signify a trend toward an even less restrictive view of what types of claims should be subordinated under section 510(b). This Court must now look to the nature of the relationship between the parties to determine whether it should fall within the broad scope of section 510(b).

5. *Purchase or sale of securities in the present case*

■ The Spano Claimants alleged in their complaint against Tawfik that they contributed equity (approximately $16,000) to the original entity that evolved into PT–1, that they contributed essential services to the operation of the company and that they were then abruptly locked out of further contact with the company by Tawfik. At the time of the creation of PT–1 though, no securities had been issued to anyone. It is admitted by the Spano Claimants in their complaint that an attorney was hired to draft a shareholder agreement, but that the agreement was never signed and no stock certificates were ever issued. In their factual allegations in the complaint, however, the Spano Claimants did allege that there was some issuance of stock. They alleged that in 1995, unbeknownst to them, PT–1 (directed by Tawfik) secretly issued over 30 million shares of stock to Tawfik and Thomas Hickey. They alleged that Tawfik never informed them that PT–1 had issued the shares at all, much less sold them to someone else. It seems to this Court that this is precisely the transaction that gave rise to the causes of action contained in the state court complaint against PT–1. It is apparent that had the Spano Claimants been issued shares on that day, they would not be here today with a claim against the bankruptcy estate.

Whether labeled an action for tortious interference with contractual relations or breach of fiduciary duties, it seems that the Spano Claim stems from the alleged failure of PT–1 to issue them the shares they were entitled to pursuant to their equity contribution and the alleged oral contract. The question then becomes whether the failure to receive shares in the company when shares were issued, and when the Spano Claimants were seemingly entitled to receive them, creates damages that can be considered "arising from" a securities transaction under section 510(b).

■ The Spano Claimants argue that there must be some "causal nexus" between a sale of securities and the damages therefrom and that in the present case that nexus did not exist. In fact, the rule of law is just that, but under the broad reading of section 510(b), the claim need not flow directly from the securities transaction, but can be viewed as "arising from" the transaction if the transaction is part of the causal link leading to the injury. *See In re NAL Fin. Group, Inc.*, 237 B.R. 225, 231 (Bankr.S.D.Fla.1999); *In re Granite Partners*, 208 B.R. 332, 339 (Bankr. S.D.N.Y.1997). This court chooses to adopt the broad reading of the statute in determining that the damages did flow from a *purchase* of securities, albeit not any ordinary purchase.

The damages alleged by the Spano Claimants are linked to the issuance of the 30 million shares to Tawfik in 1995. No shares were issued to the Spano Claimants at that time. It is that failure to issue shares that led to the state court action and eventually to the bankruptcy claim. The Spano Claim can be considered to have "arisen from" the securities transaction between PT–1 and Tawfik under a broad reading of section 510(b).

Analogies can be made to a case in which a corporation breached a contract to

use its best efforts to register stock, *see In re Telegroup*, 281 F.3d 133 (3d Cir.2002), and also one in which a corporation failed to properly deliver shares after the securities transaction, *see In re Betacom*, 240 F.3d 823 (9th Cir.2001). In the present case, the Spano Claimants were allegedly entitled to receive shares in the company. There was a transaction whereby shares were issued to Tawfik. The Spano Claimants did not receive any shares in the company, despite an equity contribution that purportedly secured their right to receive such shares. An inverse analysis of the statute is required in this particular case, and although it is an indirect path to complete the analysis, it is this Court's opinion that the Spano Claim did arise out of a purchase of securities, namely PT–1's alleged issuance of shares to Tawfik in 1995 and its failure to issue similar shares to the Spano Claimants at that time.

■ To further support this rationale, one court has noted that "nothing in [section] 510(b)'s text requires a subordinated claimant to be a shareholder." *See In re Walnut Equipment Leasing Co.*, 1999 WL 1271762, 1999 Bankr.LEXIS 1626 (Bankr. E.D.Pa.1999). "The language of section 510(b) does not limit its application to any particular type of claimant but, rather, focuses on the type of claim possessed." *Id.* This Court chooses to follow this line of reasoning in holding that, although no shares were issued to the Spano Claimants, the Spano Claim is a type of claim that is proper for subordination.

### 6. Policy Concerns

Due to the relationship between the parties and the unique set of facts in this case, it is important to look to the policy behind section 510(b) in order to determine whether this is the type of situation envisioned by Congress for subordination treatment under that section.

It is well-established that in enacting section 510(b) Congress followed the reasoning of a celebrated law review article written by law professors John Slain and Homer Kripke. *See* John Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L.REV. 261 (1973). The essential elements of their argument were rooted in the concepts of risk allocation to investors and creditors.

Slain and Kripke believed that the bankruptcy courts' favorable treatment of shareholder fraud claims were giving investors an unfair advantage over creditors. By allowing shareholder fraud claims to share *pari passu* with unsecured creditors was essentially giving investors a windfall by giving them an opportunity to reap the benefits of a profitable entity and by allowing them to share with creditors in the event the enterprise was forced to reorganize or liquidate. *See Id.* at 286–91.

They also reasoned that by allowing investors to share with creditors, essential capital was diluted that would normally be used to pay creditors in a bankruptcy case. The creditors who relied on this equity cushion when extending credit were being prevented from satisfying their claims due to the absence of equity. *Id.* Thus, the investors were taking little risk and had an opportunity to profit, while the creditors were risking the possibility that their claims would not be satisfied, but had no similar opportunity to profit.

These policy concerns were adopted by Congress, and can be reduced into two statements. First, only the investors should bear the risk that their equity interest will be wiped out by fraud or other surreptitious means. Second, creditors rely on the equity cushion of the invest-

ment when extending credit. *See In re Geneva Steel Co.*, 281 F.3d at 1180 (citing *Granite Partners*, 208 B.R. at 342).

The Spano Claimants contributed original equity into the entity that became PT-1. It is reasonable to assume that at that point they expected a return on their investment if the business was successful. Assuming they were sophisticated investors, they would also be taking certain risks involved with the formation of the business, namely, that the business may fail, or in this case, that they would lose their investment due to some type of fraud or misdealing. In fact, pointing again to the complaint in the state court action, the Spano Claimants alleged that shares were sold secretly to Tawfik in exchange for capital, effectively freezing them out of the business. It seems to this Court that this is just the type of burden that should be borne by investors and not creditors. Trade creditors and the like should not have to share the effects of lost equity with the seemingly sophisticated investors who contributed the equity at the outset.

Additionally, unsecured creditors would certainly have relied on an equity cushion to satisfy their claim in the event of insolvency of the Debtors. They would hope that the money invested by the Spano Claimants, in the event of insolvency, would be first used to satisfy their claim, and would not want to have to bear the risk of sharing the equity with the investors as the ship goes down.

It is thus reasonably clear that the present situation is in line with Congressional policy concerns with respect to subordination under section 510(b) of the Bankruptcy Code.

## IV. Conclusion

The Spano Claimants are clearly victims in this case. This Court is not unsympathetic to the concerns of investors who fall victim to unscrupulous business practices, and it is was certainly not Congress' objective to stifle capital investment in start-up ventures. However, a balance must be struck between the concerns of the average investor and the unsecured trade creditor who provides products and services necessary for the business to succeed and for the investor to earn profits. That is what Congress envisioned by enacting section 510(b) of the Bankruptcy Code and that is the spirit by which this decision is rendered.

The Spano Claimants allegedly contributed capital into the formation of PT-1. If that is the case, then they were entitled to receive an equity share in the enterprise. When the shares were allegedly issued in 1995, and they were not included, they may have been harmed. That is not for this Court to decide at this time. What has been decided is that the claim filed in the bankruptcy case of the Debtors was based on damages that were linked by cause to a transaction involving securities in PT-1. While the facts of this case do not fit squarely into the framework of the statute, this Court believes that the Spano Claim should be subordinated to the class of unsecured creditors.

For the foregoing reasons, the Debtors' motion to subordinate the claim of the Spano Claimants is hereby GRANTED.

This Court will not undertake to determine the amount of the Spano Claim at this time. When the Debtors are ready to move for confirmation of a plan of reorganization and the facts reveal the amounts to be paid to the creditors as to whom the Spano Claim is subordinated, this Court will proceed to fix the amount of the claim only in the event the amount to be distributed to creditors is not to be adversely affected.

The Debtors are directed to settle an order in accordance with this decision.