MURTHA, District Judge.
 

 Defendant-appellant David Rombro appeals from a judgment entered in the United States District Court for the Eastern District of New York (Seybert,
 
 J.)
 
 affirming the order of the bankruptcy court
 
 *253
 
 (Bernstein,
 
 Bankr, J.)
 
 granting summary judgment to plaintiff-appellee Michael Du-frayne, trustee of the Med Diversified, Inc. Creditors’ Trust, and subordinating Rom-bro’s claim against Med Diversified under 11 U.S.C. § 510(b), which mandates subordination of “a claim ... for damages arising from the purchase or sale of ... a security [of the debtor].” In this appeal we consider the scope of section 510(b), specifically whether the statute requires subordination of the claim of a former executive employee of the debtor, when the claim is based on the debtor’s failure to issue its common stock to the executive in exchange for his stock in another company, as provided by a termination agreement. Because we agree with the lower courts’ conclusion that such a claim “arises from” the purchase of the debtor’s stock within the meaning and purpose of section 510(b), we affirm the judgment.
 

 I. BACKGROUND
 

 The relevant facts of this case are undisputed. In 2000 and 2001, Med Diversified, Inc. (then apparently known as “e-Med-Soft.com”) and David Rombro entered into executive employment agreements. Med Diversified first agreed to hire Rombro as President and COO of its pharmacy division, and subsequently agreed to hire Rombro as President and CEO of its health services and managed care division. Later in 2001, however, due to certain disputes, the parties entered into a termination agreement. Therein, Med Diversified agreed to issue by January 2, 2002, 905,500 shares of its common stock to Rombro in exchange for Rombro’s 905,500 shares of PrimeRx stock. The termination agreement also provided that, except for the stock exchange and other minor payments, Med Diversified owed Rombro no other salary or benefits, and each party released any claims, other than breach of the agreement itself, arising out of Rom-bro’s employment or termination. The stock exchange failed to occur by January 2, 2002, however, and Rombro brought suit for breach of contract and fraudulent inducement.
 

 Thereafter, on November 27, 2002, Med Diversified filed for relief under chapter 11 of the Bankruptcy Code, causing the automatic stay of Rombro’s lawsuit. On July 29, 2003, Rombro filed a timely proof of claim against Med Diversified (“debtor”) for $926,540 (“Claim 661”), premised on Med Diversified’s alleged breach of the termination agreement by failing to issue to Rombro its common stock in exchange for his PrimeRx stock.
 

 On November 12, 2004, Michael Du-frayne, trustee of the Med Diversified, Inc. Creditors’ Trust, filed a complaint against Rombro. Dufrayne subsequently moved for summary judgment, seeking a determination that Claim 661 is subject to mandatory subordination pursuant to section 510(b) of the Bankruptcy Code. The statute provides in pertinent part:
 

 (b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debt- or, for
 
 damages arising from the purchase or sale of such a security,
 
 or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.
 

 11 U.S.C. § 510(b) (emphasis added). Rombro filed a cross-motion for summary judgment, seeking a determination that Claim 661 was not subject to subordination but rather was a general unsecured claim for compensation which should share
 
 pari passu
 
 with the class of general unsecured creditors. Rombro argued for a literal
 
 *254
 
 reading of “arising from” under section 510(b), requiring that the trustee show Rombro’s damages flow from the actual purchase or sale of the debtor’s security in order for Claim 661 to be subordinated. In Rombro’s view, his claim did not arise from damages flowing from the purchase or sale of debtor’s stock but from the purchase by the debtor of Rombro’s Prim-eRx stock, which in any event never occurred.
 

 In a well-reasoned, unpublished decision dated February 23, 2005, the bankruptcy court (Bernstein,
 
 Bankr. J.)
 
 granted summary judgment to the trustee and subordinated Claim 661. Judge Bernstein determined, in accordance with case law broadly construing section 510(b), that “the claim need not flow directly from the securities transaction, but can be viewed as ‘arising from’ the transaction if the transaction is part of the causal link leading to the injury,” quoting
 
 In re PT-1 Communications,
 
 304 B.R. 601, 608 (Bankr.E.D.N.Y.2004). The court concluded that because Rom-bro’s claim was based on the debtor’s alleged failure to issue Rombro shares of its stock as required by the termination agreement, there was a causal link between the securities transaction and the injury. Consequently, pursuant to section 510(b), the bankruptcy court subordinated Rombro’s claim and deemed it to have “the same priority as the debtor’s common stock for purposes of distribution under the [bankruptcy] Plan.”
 

 Rombro appealed the bankruptcy court’s order to the district court (Seybert,
 
 J.),
 
 which affirmed the order in an unpublished decision dated October 24, 2005. Judge Seybert likewise determined that section 510(b) is to be construed broadly because it is a remedial statute intended “to prevent shareholders from changing their claims into creditors’ claims.” Importantly, the district court concluded:
 

 Section 510(b) covers [Rombro’s] Claim 661 despite the fact that [Rombro] never actually received any shares in Debtor. [Rombro] bargained for a position as shareholder and all its attendant benefits
 
 and
 
 risks, including Debtor’s inability to fulfill its contractual obligations with creditors
 
 and
 
 its shareholders. [Rombro] cannot expect to both reap a shareholder’s benefits when the Debtor was profitable and then avoid a shareholder’s risks by gaining creditor status when Debtor went bankrupt.
 

 (Emphases in the original.) Rombro again appealed the adverse judgment.
 

 II. DISCUSSION
 

 “Review of an order of a district court issued in its capacity as an appellate court is plenary.”
 
 In re DeTrano,
 
 326 F.3d 319, 321 (2d Cir.2003) (citation omitted). In a bankruptcy appeal, “we review the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law
 
 de novo.” Ball v. A.O. Smith Corp.,
 
 451 F.3d 66, 69 (2d Cir.2006) (citation and internal quotation marks omitted).
 

 The question before us is whether a claim for damages based on the debtor’s failure to issue shares of its common stock in exchange for the claimant’s stock in another company, pursuant to a termination agreement, is “a claim ... for damages arising from the purchase or sale of ... a security [of the debtor]” within the meaning of section 510(b). Facing similar questions, the Third Circuit subordinated claims when the debtor breached a contractual obligation to use best efforts to register the claimants’ stock,
 
 In re Telegroup, Inc.,
 
 281 F.3d 133 (3d Cir.2002), and the Ninth Circuit subordinated claims when the debtor failed to convey its stock as required by a merger agreement,
 
 In re Betacom of Phoenix, Inc.,
 
 240 F.3d 823
 
 *255
 
 (9th Cir.2001). The holdings of most prominent decisions of local bankruptcy courts also support the broad interpretation of section 510(b).
 
 See, e.g., In re Enron Corp.,
 
 341 B.R. 141, 162-63 (Bankr. S.D.N.Y.2006) (subordinating claims arising from ownership of employee stock options; concluding “the broad application] of section 510(b) is now quite settled”);
 
 In re PT-1 Commc’ns.,
 
 304 B.R. at 610 (subordinating a claim based on failure of the debtor to issue securities). Moreover, on very similar facts, the Bankruptcy Court for the District of Delaware held that section 510(b) required the subordination of a former employee’s claim for damages arising from breach of a severance agreement to issue stock to the employee.
 
 In re Worldivide Direct, Inc.,
 
 268 B.R. 69, 73 (Bankr.D.Del.2001). In this Circuit, however, the scope of section 510(b) is a matter of first impression. Rombro concedes relevant case law trends against him, but asks the Court to consider whether this is a situation that extends the reach of section 510(b) beyond its legislative history and purpose.
 

 Rombro primarily raises three arguments against the mandatory subordination of his claim: (1) the phrase “arising from” in section 510(b) is unambiguous and plainly applies only to claims stemming directly from a purchase, sale, or rescission of the debtor’s security, none of which occurred here; (2) the exchange of Rom-bro’s shares of PrimeRx stock for debtor’s stock was not a “purchase” but rather a severance payment arrangement — a debt owed him — and therefore the district court erred in concluding Rombro was a purchaser, transferee, or holder of debtor’s common stock within the meaning of the statute; and (3) the policy rationales for subordination do not apply to Rombro’s claim. The trustee responds, in sum, that claims “arising from” the purchase of a security covered by section 510(b) include claims that are predicated on the failure to issue stock, relying on case law broadly interpreting the statute, particularly the analogous case of
 
 Worldwide Direct.
 

 We begin with Rombro’s argument regarding the statutory text because “[the] first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.”
 
 Robinson v. Shell Oil Co.,
 
 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). We find that the phrase “arising from” is reasonably susceptible to both Rombro’s narrow construction and the trustee’s broader reading, and therefore conclude that the phrase is ambiguous.
 
 See 2A
 
 Norman J. Singer,
 
 Sutherland Statutory Construction
 
 § 45:2 (6th ed.);
 
 accord In re Telegroup, Inc.,
 
 281 F.3d at 138;
 
 In re Geneva Steel Co.,
 
 281 F.3d 1173, 1178-79 (10th Cir.2002) (relying on
 
 In re Granite Partners, L.P.,
 
 208 B.R. 332, 339 (Bankr.S.D.N.Y.1997));
 
 In re Enron,
 
 341 B.R. at 149.
 

 Because the phrase “arising from” is ambiguous as applied to the claims in this case, we must “look outside the text of the statute to determine its intended meaning.”
 
 Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt International B.V. v. Schreiber,
 
 327 F.3d 173, 181 (2d Cir.2003). As every court confronting section 510(b) has noted, discussion of the statute’s purpose begins with its legislative history, contained principally in the House Report on the 1978 Bankruptcy Reform Act, and with the journal article that motivated the promulgation of the statute.
 
 See
 
 H. Rep. No. 95-595, at 194-96, Bankruptcy Reform Act of 1978 (1977) (“House Report”),
 
 citing with approval
 
 John J. Slain
 
 &
 
 Homer Kripke,
 
 The Interface Between Securities Regulation and Bankruptcy-Allocating the Risk of Illegal Securities Issuance Between Securityholders and the
 
 
 *256
 

 Issuer’s Creditors,
 
 48 N.Y.U. L.Rev. 261 (1973) (“Slain
 
 &
 
 Kripke”).
 

 In enacting section 510(b), Congress focused on the problem of claims alleging fraud or other violations of law in the issuance of the debtor’s securities.
 
 See
 
 House Report at 194 (“A difficult policy question to be resolved in a business bankruptcy concerns the relative status of a security holder who seeks to rescind his purchase of securities or to sue for damages based on such a purchase: Should he be treated as a general unsecured creditor based on his tort claim for rescission, or should his claim be subordinated?”). In their seminal article, Slain and Kripke argued compellingly for mandatory subordination because the bankruptcy courts’ favorable treatment of shareholder fraud claims provided “investors a windfall by giving them an opportunity to reap the benefits of a profitable entity and by allowing them to share with creditors in the event the enterprise was forced to reorganize or liquidate.”
 
 In re PT-1 Commc’ns,
 
 304 B.R. at 609 (citing Slain & Kripke at 286-91). Congress agreed and in enacting section 510(b), adopted Slain and Kripke’s policy rationales for mandatory subordination: “1) the dissimilar risk and return expectations of shareholders and creditors; and 2) the reliance of creditors on the equity cushion provided by shareholder investment.”
 
 In re Betacom,
 
 240 F.3d at 830; see also House Report at 194-96 (expressly adopting or relying on Slain & Kripke);
 
 In re Telegroup,
 
 281 F.3d at 138-41 (discussing the legislative history of section 510(b)).
 

 “Section 510(b) thus represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy.”
 
 In re Telegroup,
 
 281 F.3d at 141 (citation omitted);
 
 see also In re Enron,
 
 341 B.R. at 163-66 (discussing Slain and Kripke’s risk allocation arguments). Put another way, with the statute Congress “expressed a concern with adapting bankruptcy distribution to the differing expectations of shareholders and general creditors.”
 
 In re Betacom,
 
 240 F.3d at 827 (quoting the Bankruptcy Court below).
 

 Because there are only two rationales for mandatory subordination expressly or implicitly adopted by the Congress that enacted section 510(b), we conform our interpretation of the statute to require subordination here only if Rombro (1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor. We conclude that Rombro took on the risk and return expectations of a shareholder when he agreed to exchange securities in PrimeRx and employment claims for the shares of the debtor, and that his resulting claim for damages therefore must be subordinated.
 

 Rombro argues, to the contrary, that there is no difference between the debtor’s promise to purchase his PrimeRx stock with debtor’s own stock and the promise to make a cash severance payment to him. There is an important difference, however, on which our decision depends: Rombro bargained not for cash but to become a stockholder in the debtor. Once he entered a binding agreement obligating him to purchase shares of the debtor in return
 
 for
 
 his shares
 
 of
 
 PrimeRx, and to forego the significant cash compensation to which he otherwise was due upon termination, he became bound by the choice he made to trade the relative safety of cash compensation for the upside potential of shareholder status — the very choice highlighted by Slain and Kripke. Rombro thus “had the
 
 *257
 

 potential
 
 benefit of the proceeds of the enterprise deriving from ownership of the securities.”
 
 In re Betacom,
 
 240 F.3d at 830 (quoting House Report at 195) (emphasis added).
 
 Accord In re Worldwide Direct,
 
 268 B.R. at 73 (“By the Severance Agreement, the Claimant agreed to accept stock in lieu of any cash payment to which he may have been entitled. He bargained for status as a shareholder, rather than a creditor. Such a claim is properly subordinated under section 510(b).”).
 

 In reaching this conclusion, we are influenced by what appears to be the uniform determination of courts presented with similar claims that those who conclude the bargain to become investors or shareholders should be treated as such.
 
 [1]
 
 Thus, as the Ninth Circuit explained when subordinating claims of individuals who allegedly did not receive the shares they were due and never had an opportunity to share in the benefits of ownership, “[e]ven if an investor never receives her promised shares, she entered into the investment with greater financial expectations than the creditor. The creditor can only recoup her investment; the investor expects to participate in firm profits.”
 
 In re Betacom,
 
 240 F.3d at 830. Likewise, the Third Circuit concluded that claims of individuals who were unable to sell shares they were allegedly due because the shares were not registered should be subordinated.
 
 In re Telegroup,
 
 281 F.3d at 136.
 

 To be sure, it could be argued that ... appellants’ claims [should not be subordinated] because the claims seek compensation for a risk that appellants did not assume---- In particular, although claimants, as equity investors, assumed the risk of business failure, they did not assume the risk that [the debtor]’s stock would not be publicly tradeable.... This objection to subordinating appellants’ claims, however, proves too much, as it would apply equally to shareholders’ claims for fraud in the issuance ... [which] nonetheless fall squarely within the intended scope of § 510(b).
 

 Id.
 
 at 142-43.
 

 Helpful too is the recent and extraordinarily thorough decision in
 
 In re Enron,
 
 in which the bankruptcy court considered whether to subordinate claims by employees for damages they allegedly suffered when, due to the debtor’s fraud, they chose not to exercise stock options immediately when they vested but to hold onto the options with hopes for future higher returns.
 
 See
 
 341 B.R. 141. Like Rombro, the Enron claimants argued their stock options were a form of cash compensation, and therefore their claims were akin to those of creditors, not shareholders. The court reasoned, however, that the cash value of the options varied with the value of the debtor’s stock, and to that extent resembled a typical equity interest — and moreover, any damages claimants sought would be the type of “damages flowing from changes in the debtor’s share price,” implicitly referred to by section 510(b).
 
 Id.
 
 at 157, 167-68. Similarly, because Rombro’s claim for damages is not a fixed amount but rather connected to the value of debtor’s stock,
 
 [2]
 
 we are inclined to read
 
 *258
 
 section 510(b) broadly to include Ms claim for damages.
 

 In reaching our conclusion, we once again “heed the observation made many years ago by the Eighth Circuit: ‘When a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion.’ ”
 
 Matter of Stirling Homex Corp.,
 
 579 F.2d 206, 213 (2d Cir.1978) (quoting
 
 Newton Nat’l Bank v. Newbegin,
 
 74 F. 135, 140 (8th Cir.1896)),
 
 cert. denied
 
 439 U.S. 1074 (1979).
 

 We note, however, our equal concern for guarding against attempts by a bankruptcy debtor to clothe a general creditor in the garb of a shareholder, which Rombro argues is the case here. Indeed, unlike the
 
 In re Telegroup
 
 claimants, who had received unregistered stock, 281 F.3d at 136, and unlike the
 
 In re Betacom
 
 claimants, who had refused to accept the debt- or’s shares when offered, 240 F.3d at 830, Rombro had not received Med Diversified’s stock by the agreed-upon date. See also
 
 In re Granite Partners,
 
 208 B.R. at 334 (alleging post-investment fraud). Rombro further argues that because the stock exchange never occurred, the district court incorrectly concluded that he was a “transferee of Debtor’s common stock in a voluntary transfer,” within the meaning of the statute.
 
 See
 
 11 U.S.C. § 101(43) (“The term ‘purchaser’ means transferee of a voluntary transfer, and includes immediate or mediate transferee of such a transferee.”);
 
 id.
 
 § 101(54) (defining “transfer” as, among other things, “each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of
 
 or
 
 parting with ... an interest in property.”).
 

 Courts responding to similar arguments have concluded that a claimant need not be an actual shareholder for his claim to be covered by the statute.
 
 See In re PT-1 Commc’ns,
 
 304 B.R. at 609 (“nothing in [section] 510(b)’s text requires a subordinated claimant to be a shareholder”) (quoting
 
 In re Walnut Equip. Leasing Co., Inc.,
 
 1999 WL 1271762, at *6 (Bankr.E.D.Pa. Dec.28, 1999) (alteration incorporated)). For example, the court in
 
 In re Enron
 
 concluded that an employee’s claim based on the debtor’s failure to deliver stock at the time the employee’s stock options vested is a claim “arising from” the purchase of that stock and should be subordinated— despite the fact that the claimant had not become a shareholder. 341 B.R. at 162-63;
 
 see also id.
 
 at 150-51 (discussing whether other claimants had “purchased” unexercised stock options they received as
 
 part of
 
 an employee compensation package, and concluding employees had purchased the options with their labor). We agree with the Ninth Circuit’s reasoning that the first policy rationale for mandatory subordination applies “even if there is no ‘actual’ sale or purchase” because even “[b]efore they receive any stock or extend a line of credit, investors and creditors have different expectations.”
 
 In re Beta-com,
 
 240 F.3d at 830-31 (concluding physical possession of the stock is not always required to subordinate a claim under section 510(b)). Similarly here, once the agreement was concluded, Rombro’s expectation with respect to the debtor was that he would be able to share in its profits as an owner; the debtor’s alleged breach may have burdened Rombro’s efforts to realize that expectation, but it did not alter its fundamental character.
 

 The fact that the debtor here never issued its shares to Rombro, however, calls into question the applicability of the second rationale for mandatory subordination put forth by Slain and Kripke and adopted by the Congress that enacted section 510(b)' — the equity cushion concept. By refusing to take ownership of Rombro’s PrimeRx shares, Med Diversified ensured
 
 *259
 
 that no potential creditor could have relied on Med Diversified’s position in PrimeRx in deciding whether to extend a loan. Because the equity cushion concept is “only one part of the broader judgment concerning risk allocation,”
 
 In re Enron,
 
 341 B.R. at 166, and because we have determined that Rombro’s situation fits within the risk-allocation rationale for subordination, we are ultimately not troubled by the fact that the equity-cushion rationale is not promoted here. Like the Third and Ninth Circuits deciding similar questions, we ground our holding that Rombro’s claim should be subordinated in the risk-allocation rationale, which is “more integral to any policy analysis of section 510(b).”
 
 Id.
 
 at 166 (footnote omitted);
 
 see generally id.
 
 at 166, n. 21 (noting it is “unclear which rationale Slain and Kripke regarded as superior, if these concepts can even be neatly severed,” but “Congress and the courts have clearly elevated the issue of risk [rather than creditor reliance] to the fore.”).
 

 In conclusion, we interpret section 510(b) broadly to require subordination of the claim at issue. In doing so, however, we acknowledge the outer boundaries of the statute’s text and purpose. “Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happens to be a shareholder [or one who completed a bargain to become a shareholder], where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claim[] would not further the policies underlying § 510(b).... ”
 
 In re Telegroup,
 
 281 F.3d at 144, n. 2. In this case, however, because of the binding agreement between the parties to turn a debt into an equity interest, it is reasonably clear that Rombro’s claim is in line with policy concerns underlying section 510(b).
 

 III. CONCLUSION
 

 For the reasons stated above, we conclude that section 510’s mandatory subordination of claims “arising from the purchase or sale of [a security of the debtor]” requires subordination of Rombro’s claim. We therefore Affirm the judgment of the district court.
 

 [1]
 

 . We also find a measure of support in the fact that Congress did not elect to address this trend in the courts, leaving section 510(b) unchanged by the recent bankruptcy reform legislation, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8, 119 Stat. 23 (2005).
 

 [2]
 

 . Rombro’s precise claim for damages was $926,540, and although he apparently never explained how he calculated this amount, see Prelim. Pre-Conference Statement with Respect to Action Against David Rombro (Bankr.E.D.N.Y. Jan. 19, 2005), at 2 n. 1, it is clear that the claim is based on the debtor’s failure to deliver 905,500 shares by January 2, 2002.