**AD HOC ADELPHIA TRADE CLAIMS COMMITTEE, Appellant,**

v.

**ADELPHIA COMMUNICATIONS CORP., et al., Appellees.**

No. 05 Civ. 5707(LAK).*

United States District Court, S.D. New York.

Feb. 23, 2006.

* The additional consolidated cases are 05 Civ. 5708, 05 Civ. 6161, 05 Civ. 6388, 05 Civ. 6692, and 05 Civ. 6862.

Edward S. Weisfelner, Brown Rudnick Berlack Israels, LLP (N.Y.C.), New York, NY, Official Committee of Unsecured Creditor of Adelphia Communications Corp., U.S. Bank National Association, as Indenture Trustee (Arahova), for Appellant.

Marc Ronald Abrams, Terence Kevin McLaughlin, Willkie Farr & Gallagher LLP (N.Y.), New York, NY, for Appellees.

## MEMORANDUM AND ORDER

KAPLAN, District Judge.

These are appeals from orders of the Bankruptcy Court approving three related settlement agreements relating to the Adelphia Communications scandal and adhering to that decision on reconsideration. One of the appellees cross-appeals from so much of the order approving the settlement agreements as authorized the debtors to grant to certain banks liens in entities that allegedly should be conveyed to the debtors free and clear of all liens.

*The Appeals*

In March 2002, Adelphia Communications Corp. ("Adelphia"), a company dominated by the Rigas family, disclosed that it was jointly and severally liable for more than $2 billion of borrowings attributed to certain entities owned by the Rigas interests but managed by Adelphia (the "RMEs") and that these liabilities were not reflected on Adelphia's consolidated balance sheets. It appeared also that part of those borrowings had been advanced to various Rigas family entities.

These disclosures set in motion a series of events disastrous for Adelphia, including the withdrawal of its auditors' opinion on its financial statements, defaults on credit facilities, delisting of its stock, governmental investigations, and a Chapter 11 filing by the company. The Securities and Exchange Commission ("SEC") sued the company and filed a proof of claim in the bankruptcy for, among other things, penalties, disgorgement, and prejudgment interest, which the SEC staff has indicated could amount to several billions of dollars. The risk of indictment hung over Adelphia. John and Timothy Rigas ultimately were indicted and convicted in this Court of conspiracy and mail and bank fraud.

After protracted negotiations, Adelphia reached three interrelated settlement agreements with the Department of Justice ("DOJ"), the SEC, and the Rigases, the terms of which are summarized aptly in the opinion below and need not be repeated here save to note that principal terms included (1) the forfeiture by the Rigas family to the government of their interests in all but two of the RMEs followed by the government's conveyance of the forfeited entities to the company, (2) a contribution by Adelphia of $715 million to a government-established restitution fund for the purpose of providing restitution to persons who held publicly-traded securities of Adelphia that, in the government's determination, were victims of the fraud alleged in the Rigas indictment, (3) resolution of the SEC complaint by a consent injunction without payment by Adelphia of any disgorgement or civil penalty, and (4) agreement by the DOJ not to indict the company.

The appellants here, all unsecured creditors, were and remain deeply upset by the proposed settlement because its effect would be to allow equity holders to recover from the government-established restitution fund and thus to be paid ahead of them. They argued below primarily that the settlements were not in the best interests of the estate or fair, reasonable, and adequate, and that they violate the absolute priority rule.

■ In a comprehensive and able opinion,[1] Bankruptcy Judge Robert E. Gerber rejected these and other arguments and approved the settlements. He adhered to that ruling on reconsideration.[2] Having carefully considered the briefs and heard oral argument, I reject appellants' contentions, substantially for the reasons given by Judge Gerber. I write only to make a few additional observations.

First, at the core of appellants' argument are the related contentions that the government coerced the company into the settlements by the threat of indictment and that the court below failed to determine whether the government was bluffing.

The coercion argument is baseless. As Judge Gerber correctly noted, "where ... 'coercion' results from differences in bargaining power, as a consequence of law or fact, or governmentally granted authority and discretion (such as the authority and discretion we grant to prosecutors, to achieve a common good), that is a wholly different kind of 'coercion.' As one of the banks' counsel aptly noted in argument on this motion, it is what we call 'leverage.' "[3] What the appellants characterize as coercion was no different in principle than the pressure that leads the overwhelming majority of defendants in criminal cases to plead guilty—the risk that a conviction after trial will result in a harsher sentence than is likely to be imposed following a guilty plea. Yet guilty pleas in such circumstances rightly are considered voluntary and uncoerced in any relevant sense. In *United States v. Baum*,[4] for example, this Court found that a guilty plea was voluntary and uncoerced despite a claim that the defendant felt impelled to plead by the imminence of the trial and her alleged feeling that her counsel was not fully prepared. I wrote:

"[I]t must be borne in mind that the issue of coercion in this context is not a purely subjective one. 'When a guilty plea is challenged as being the product of coercion, our concern is not solely with the subjective state of mind of the defendant, but also with the constitutional acceptability of the external forces inducing the guilty plea.'[5] So, for example, 'a State may encourage a guilty plea by offering substantial benefits in return for the plea,' including 'the possibility or certainty not only of a lesser penalty than the sentence that could be imposed after a trial and a verdict of guilty, but also of a lesser penalty than that *required* to be imposed after a guilty verdict by a jury.'[6] Such offers often present defendants with choices among unpleasant alternatives. But the fact that a plea of guilty is the most attractive option for the defendant from a subjective point of view does not render its offer constitutionally coercive. In other words, regardless of a defendant's subjective state of mind, the Constitution does not make the pressure generated by such entirely appropriate

---

1. *In re Adelphia Comm. Corp.*, 327 B.R. 143 (Bankr.S.D.N.Y.2005).

2. *Id.*, 327 B.R. 175 (Bankr.S.D.N.Y.2005).

3. 327 B.R. at 166.

4. 380 F.Supp.2d 187 (S.D.N.Y.), *aff'd*, 139 Fed.Appx. 366 (2d Cir.2005).

5. *Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir. 1986); *cf. Miller v. Fenton*, 474 U.S. 104,

115–16, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) ("Although sometimes framed as an issue of 'psychological fact,' the dispositive question of the voluntariness of a confession has always had a uniquely legal dimension.").

6. *Corbitt v. New Jersey*, 439 U.S. 212, 219–20, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978) (internal quotation marks and citations omitted).

facets of the criminal process inappropriate."[7]

So too here. The government encouraged Adelphia to enter into the settlements by offering substantial benefits—including the elimination of the threat of criminal prosecution and of any SEC claim for disgorgement and civil penalties—in exchange for its agreement to the settlements. While the alternatives presented all were unpleasant, that does not render the situation coercive in any legally relevant sense. If, as is the case, a defendant constitutionally may be induced to plead guilty to a crime carrying a prison sentence by a threat that a trial could result in imposition of a death penalty,[8] surely Adelphia could pay $715 million to avoid indictment, with all its disastrous consequences, and a $5 billion disgorgement and penalty claim by the SEC.

The contention that the court below did not inquire into whether the government was bluffing in threatening to indict the company is, if anything, less meritorious. The record before Judge Gerber overwhelmingly demonstrated that the government explicitly threatened indictment and took an exceptionally "hard-nosed" position with respect to the amount that Adelphia would be required to pay in order to avoid that fate. That evidence was more than sufficient to justify Judge Gerber's findings that the risks that Adelphia faced were "of extraordinary magnitude"[9] and that there was "a 'real risk' of a criminal indictment ... that would have [had] disastrous consequences to this reorganization."[10] Certainly there was no clear error.

Finally, appellants object strenuously to the settlements on the ground that the government is likely to distribute the victim restitution fund in part to equity security holders who could not take ahead of the appellants in a plan of reorganization in light of the absolute priority rule. Their premise is correct, as the court below recognized. The conclusion, however, does not follow. As Judge Gerber held, any payments from the restitution fund would be from "a fund to be created and owned by the Government," not a distribution of assets of the debtors' estates as part of a plan of reorganization.[11] They therefore would not come within the language of Sections 510(b) and 1129 of the Code.[12] Moreover, it is worth noting that if Adelphia had rejected the government's proposal and the government succeeded in forfeiting its assets, the government's interest in the assets would have been superior to those of the creditors in any case.

Appellants' unhappiness at the idea of a substantial distribution of assets that originated in the estate to equity holders who would have been subordinate to them had the assets been distributed as part of a plan of reorganization is entirely understandable. The proper focus for any complaint, however, is Congress, which alone is empowered to alter the terms of the Code to achieve the end that appellants desire.

*The Cross–Appeal*

Despite joining the debtors in supporting the settlements generally, the Official Committee of Equity Security Holders of Adelphia (the "Equity Committee") cross-appeals as to the Bankruptcy Court's ap-

---

**7.** *Baum,* 380 F.Supp.2d at 210.

**8.** *E.g., Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

**9.** 327 B.R. at 160.

**10.** *Id.*

**11.** *Id.* at 169.

**12.** U.S.C. §§ 510(b), 1129.

proval of that part of the deal that preserved certain banks' pre-petition liens on the equity interests in the RMEs. Although the Equity Committee contends that the Bankruptcy Court did not hear from the interested parties or consider the issue properly before approving the preservation of the liens, the opinion demonstrates otherwise.[13] The decision to preserve the pre-petition liens as part of the approval of the Settlement was well within the Bankruptcy Court's discretion.

*Conclusion*

For the foregoing reasons, the orders appealed from are affirmed in all respects.

SO ORDERED.

---

13. *See, e.g.,* 327 B.R. at 154, 168, 173.