**In re ENRON CORP., et al.,
Reorganized Debtors.**

No. 01–16034 (AJG).

United States Bankruptcy Court,
S.D. New York.

May 2, 2006.

Weil, Gotshal & Manges LLP, Martin J. Bienenstock, Brian S. Rosen, Martin A. Sosland, Melanie Gray, of Counsel, New York, NY, for Reorganized Debtors.

James A. Armogida, Houston, TX, Pro Se.

Edward J. Billings, Pro Se.

Jerry K. Castleman, Pro Se.

Manuel A. Garcia, Pro Se.

David L. Johnson, Pro Se.

Thomas C. McBarron, Pro Se.

Dorothy L. McCoppin, Houston, TX, Pro Se.

Lee H. Sheldon, Pro Se.

William J. Travers, Pro Se.

## OPINION REGARDING EMPLOYEE CLAIMS RELATED TO OWNERSHIP OF STOCK OPTIONS, AND GRANTING 13TH, 19TH, AND 22ND OMNIBUS OBJECTIONS TO PROOFS OF CLAIM

ARTHUR J. GONZALEZ, Bankruptcy Judge.

### I. Introduction

Before the Court are Enron Corp.'s ("Debtor" or "Enron") 13th, 19th, and 22nd Omnibus Objections to Proofs of Claim (collectively, the "Objections"), filed on August 25, 2003, November 7, 2003, and December 2, 2003, respectively. The Court has previously ruled on a substantial majority of the objected to claims and will now address those remaining claims related to employee stock options (collectively, the "Stock Option Claims").[1] The Stock

---

1. For the Court's previous orders on the Objections, see Debtor's 13th Omnibus Objection to Proofs of Claim, Docket No. 12432, and related documents; 19th Omnibus Objection, Docket No. 14082, and related documents; 22nd Omnibus Objection, Docket No. 14592,

Option Claims were filed by a number of former employees of the Debtor (the "Stock Option Claimants" or "Claimants") and assert a right to payment for damages in connection with unexercised stock options the Claimants received during the course of their employment.[2]

The Stock Option Claims collectively present shared issues of law despite any factual differences. The Debtor argues that the Stock Option Claims should be subordinated pursuant to 11 U.S.C. § 510(b) as claims "for damages arising from the purchase or sale of . . . a security." As subordination would effectively preclude recovery, the Stock Option Claimants unsurprisingly reject this assertion. Though, in reaching its conclusion, the Court will address the Stock Option Claims in discrete sets, there is an essential question of first impression that the Court must resolve: namely, whether claims for damages related to employee stock options are subject to subordination under section 510(b). Having reviewed the parties' pleadings, the statutory text, and the relevant case law, the Court finds that claims for damages that arise from the ownership of employee stock options— as such claims and options are presented here—should be subordinated pursuant to section 510(b).[3]

## II. Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). This Court has postconfirmation jurisdiction under paragraph 60 of this Court's Order Confirming Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, and Related Relief (the "Plan"), dated July 15, 2004. *Hospital and University Property Damage Claimants v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 7 F.3d 32, 34 (2nd Cir.1993).

## III. Background

The history of the Debtor's financial decline is familiar to all involved and need not be related in detail here. Briefly, on December 2, 2001 (the "Petition Date"), the Debtor and certain of its affiliated debtor entities filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code"). Prior to this date, reports of financial manipulation and irregular accounting prac-

---

and related documents; and 30th Omnibus Objection, Docket No. 17957, and related documents. For the Court's previous opinions, see Minute Order with Attached Opinion of the Court, Docket No. 29324 (filed April 6, 2006), and Minute Order with Attached Opinion of the Court, Docket No. 29325 (filed April 6, 2006).

2. The following claims will be addressed in this Opinion: Claim # 1490901, filed by James A. Armogida; Claim # 1580801, filed by Edward J. Billings; Claim # 1738201, filed by Jerry K. Castleman; Claim # 523601, filed by Manuel A. Garcia; Claims # 1215701, # 1215703, filed by David L. Johnson; Claim

# 1773500, filed by Thomas C. McBarron; Claims # 1938201, # 1938202, filed by Dorothy L. McCoppin; Claims # 654500, # 654600, filed by Lee H. Sheldon; and Claim # 1547501, filed by William J. Travers.

3. The Court notes that its conclusions apply only to stock options similar to those presented here. The Court issues no opinion as to whether stock options might be designed in such a fashion that would result in different treatment under section 510(b). However, as discussed herein, to the extent that stock options necessarily implicate the purchase or sale of a security, it is doubtful that any stock options can be so designed.

tices had prompted a rapid and precipitous tumble in the price of the Debtor's stock, which in turn revealed additional financial liabilities, further depressing the share price. The sheer magnitude of the decline was as significant as it was rapid. From a high of roughly $90 on August 23, 2000, Enron stock was valued at only $.40 per share on the December 3, 2001, the first business day following Enron's bankruptcy filing. In particular, over a period of barely three and a half months, the share price of Enron stock dropped from $40 at the beginning of October 2001 to less than $1 by December 1, 2001. On January 15, 2001, Enron's stock was delisted by the New York Stock Exchange.

Unsurprisingly, investors suffered severe losses as a result of Enron's rapid descent into bankruptcy. As was well publicized at the time, among these injured investors were thousands of former Enron employees, most of whom were heavily invested in Enron stock as part of their retirement, savings, and compensation plans. Countless news stories have chronicled the plight of these former employees, and it is impossible not to sympathize and empathize with them. Many, likely the vast majority, of these former employees lost not just their livelihood, but also often a significant portion of their financial worth and their anticipated financial stability through their retirement years.

The former Enron employees, as with other investors, have pursued a range of remedial actions in an attempt to salvage something from the demise of Enron. In particular, class action litigation has been pursued in a number of jurisdictions on behalf of former employees. The largest of these was the *Tittle* litigation. *Tittle, et al v. Enron Corp., et al (In re Enron Corp Securities and ERISA)*, No. H 01–3913 (S.D. Tex. filed Jan. 2, 2004) (Harmon, J.) (consolidated Enron securities litigation in-

cluding the related cases *Newby et al v. Enron et al* and *The Regents of the University of California, et al v. Kenneth Lay, et al*). In *Tittle,* a class of former employees sued under the Employee Retirement Income Security Act ("ERISA"), alleging that the Debtor breached its fiduciary duty by failing to provide employees with critical investment information concerning the Debtor's financial condition and by encouraging employees to invest in the Debtor's stock. Similarly, the Official Employment–Related Issues Committee ("ERIC") and groups such as the AFL–CIO and the National Rainbow/PUSH Coalition pursued litigation in this Court on behalf of former Enron employees for additional severance payments and benefits. *See* Order of Final Approval, Approving Settlement of Severance Claims of Similarly Situated Claimants, Docket No. 6148 (August 28, 2002).

In addition to these class-action suits, roughly 7,000 proofs of claim have been filed in this Court by former employees, ranging from claims for back wages to claims for discontinued benefits and bonuses. The Stock Option Claimants are here seeking to recoup damages suffered in connection with the ownership of employee stock options.

Employee stock options were a component of Enron's compensation programs. Whether as bonuses or as part of employment agreements, stock options were frequently issued to employees in order to encourage higher quality work and to grant employees an equity stake in the company. Like most other employee stock options, Enron's stock options granted employees the right to purchase a specified number of shares at a specified future time (the vesting point). Once the option vested, the employee could then exercise the option and sell the purchased stock, capturing the difference between the op-

tion price and the current trading price, exercise the option and retain the stock, or retain the option to exercise at a later time, presumably after the trading price had increased. Employees could not, however, transfer the stock options themselves or sell the options on the open market.

Stock options are not free from risk. If the trading price is less than the option price, the stock option is practically valueless, which is particularly true here since the option could not be traded or exchanged. This was the situation faced by the Stock Option Claimants during and after the fall in the share price of Enron stock. As the share price declined, so did the likelihood that the Claimants would exercise their options. With the disclosure of financial irregularities and, ultimately, the bankruptcy filing, the stock options became for all intents and purposes worthless. The Claimants have therefore filed proofs of claim in this Court for the loss of value of their unexercised options. The Claimants allege that the losses they suffered were the result of the Debtor's fraudulent acts and seek relief on that basis.

The Court should also note that, as part of its efforts to continue operating following the filing of its petition for bankruptcy, the Debtor devised the Enron Corp. Key Employee Retention, Liquidation Incentive and Severance Plan (the "KERP Plan") in order to retain employees regarded as integral to its operations, as well as to resolve potential claims by those employees. *See* Order Approving and Authorizing Key Employee Retention Program, Docket No. 3587 (May 8, 2002). In return for a lump-sum bonus payment, employees selected for the KERP Plan agreed to release certain claims they may have held against the Debtor. Two of the Stock Option Claimants, James Armogida and Jerry Castleman, claims # 1580801 and # 1738201, respectively, (the "KERP Claimants" and the "KERP Claims"), participated in the KERP Plan and signed the accompanying release form (the "KERP Release").[4]

## IV. Discussion

### A. Issues Presented

In the Objections, the Debtor argues first, that the KERP Claims should be disallowed as released, and second that any remaining Stock Option Claims should be subordinated to the level of common stock interests pursuant to section 510(b) of the Bankruptcy Code. In the filed responses, the Stock Option Claimants deny both these contentions and respond that the Stock Option Claims are for damages flowing from the Debtor's fraudulent acts and should be allowed on that basis.

### B. *Pro Se* Claimants

Each of the Stock Option Claimants is proceeding before the Court *pro se.* The Court recognizes that *pro se* pleadings are held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). As well, courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe,* 174 F.3d 276, 280 (2nd Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2nd Cir.1994)). However, there are

---

4. Where the Court references the "Stock Option Claimants," this should be understood as including the KERP Claimants. At no point in this Opinion will the Court refer to the "Stock Option Claimants" as exclusive of the "KERP Claimants." The same is true of "Stock Option Claims" and "KERP Claims."

limits to a court's indulgence, as *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 95 (2nd Cir.1983) (quotations omitted).[5]

### C. KERP Release

The Debtor argues that the claims of James Armogida and Jerry Castleman, claims # 1580801 and 1738201, respectively, should be disallowed as released under the KERP Release. In its applicable part, the KERP Release states:

1. ... [The employee agrees to] release and forever discharge Enron Corp. and its subsidiaries and affiliated companies (the "Company") (including all of its offices, branches, parents, subsidiaries, and affiliates) and its present and former directors, officers, agents, attorneys, representatives, employees, successors, investors, shareholders, and assigns, from any and all actions, causes of action, covenants, contracts, claims, and demands whatsoever, which I ever had, now have ... by reason of my employment, or the termination of my employment, with the Company.

2. *Claims Released.* By signing this General Release, I am providing a complete waiver of all rights and claims that may have arisen, whether known or unknown, up until the date this General Release is signed (the "Release Date"), except as expressly excluded in Paragraph 3 or as specifically provided otherwise by law. This *includes,* but is not limited to, the following:

(a) Any and all claims under the law of any jurisdiction relating to employment or the termination of employment, including, but not limited to, wrongful discharge of employment; constructive discharge from employment; termination in violation of public policy; breach of contract, both express and implied; any plans or policies providing for severance payments upon the termination of employment (except as contained in the KERP Plan), and any and all claims arising out of any other laws and regulations relating to employment or employment discrimination; and

(b) Any and all claims for violation of any federal, state or municipal statute, including but not limited to, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967 (including the Older Workers Benefit Protection Act), the American with Disabilities Act of 1990, the Fair Labor Standards Act, the Worker Adjustment and Retraining Notification Act, the Texas Commission on Human Rights Act, and any other applicable state and local fair employment laws.

3. *Claims Not Released.* This General Release shall be and remain in effect in all respects as a complete General Release as to the matters released. This General Release *does not* extend to any of the following:

---

**5.** The responses filed by a majority of the Claimants were limited to narrative accounts of the Debtor's alleged fraud and did not address the legal issues raised in the Objections. Two of the Claimants did file more detailed responses that addressed the Debtor's legal arguments and asserted in turn additional policy and economic arguments.

These additional arguments form much of the basis for the Court's discussion of the Claimants' position. However, even though certain sophisticated arguments are raised, the bulk of the Claimants' arguments are still those of *pro se* litigants. Therefore, the Court reads the Stock Option Claims liberally.

(a) My Final Payments under the KERP Plan;

(b) Any rights or claims I may have under any "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") maintained by the Company in the course of my employment or any rights under any of the Company's deferred compensation plans or sales incentive plans and the EES Phantom Equity Plan;

(c) Any claim for benefits under state workers' compensation laws and state unemployment insurance laws;

(d) My right to compensation (including wages, salary, commissions, bonus and paid time off) earned during the course of my employment with any debtor company on or after the date it filed for bankruptcy court protection; however, this exception does not include claims, at law or equity, for compensation earned prior to the date the debtor employer filed for bankruptcy protection, or under any employment agreement or any other type of contract that was entered into before the date the debtor employer filed for bankruptcy court protection; and

(e) My rights under any Directors and Officers insurance policies or any agreement of indemnification as a director or officer.

Notwithstanding the foregoing, I understand that I will not be permitted to bring any claim, at law or at equity, for severance or termination payments under any employment agreement or any other type of contract, nor under any plan or policy maintained by the Company, other than for Final Payment under the KERP Plan. 2nd Declaration of Teresa Bosien ("2nd Declaration"), Docket No. 14676, Exhibit A (emphases in original).

The Debtor urges the Court to adopt a "but for" interpretation of the release language, arguing that the KERP Release applies to all claims the employee would not have but for that employee's employment with the Debtor. The KERP Claimants predictably contest this interpretation and argue that the release language, while broad, is limited to those claims arising from the Debtor's "employment actions." Both parties aver that the release language unambiguously supports their position.[6]

However, because the Court concludes that the Stock Option Claims, including the KERP Claims, should be subordinated pursuant to section 510(b), the Court need not determine the scope of the KERP Release. Therefore, the Court will not address this issue.

D. Section 510(b) Subordination

The Court thus turns now to the Debtor's contention that the Stock Option Claims, including the KERP Claims, should be subordinated pursuant to section 510(b) of the Bankruptcy Code. Section 510(b) in its relevant parts provides:

For the purpose of distribution under this title, a claim ... for damages arising from the purchase or sale of [a secu-

---

**6.** The Court has previously addressed issues related to the KERP Release in *In re Enron Corp.*, 300 B.R. 201 (Bankr.S.D.N.Y.2003) ("*Arnold*"). In *Arnold*, the Court was asked to determine the scope of the carve-out provisions of the KERP Release and held that a contractual termination payment for involuntary termination of an employment agreement did not fall within those provisions. The Court did not address the scope of the release provisions of the KERP Release in that opinion, though the Court notes that no language in the *Arnold* opinion provides support, explicitly or implicitly, for the Debtor's position.

rity of the debtor or of an affiliate of the debtor] ... shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (2006). As it is not expected that equity interests will participate in any distribution under the Debtor's reorganization plan, mandatory subordination pursuant to section 510(b) would effectively preclude the Claimants from receiving any compensation on their claim. It is also important to note that the Debtor does not admit to its liability on the Stock Option Claims. Thus, even if the Court concludes that the Stock Option Claims should not be subordinated, the Claimants still must then prove their underlying fraud allegations and any related damages.[7]

As is clear from the statutory text, a claim will be subordinated under section 510(b) if the claim is for damages and if those damages "arise from" the purchase or sale of a security. While whether a claim is for damages is presumably apparent from the face of the claim, the issue as to whether a claim "arises from" the purchase or sale of a security requires a more detailed legal analysis. In particular, the phrase "arising from" does not have a single, immediately evident meaning. The Court must therefore look to the case law and policy considerations to inform its interpretation.

The Claimants do not frame their claims in the same fashion.[8] Some Claimants characterize their claim as one for breach of contract. Other Claimants argue that the Debtor fraudulently induced their acceptance of stock options as part of their compensation package. Still other Claimants contend that the Debtor's fraudulent activities caused them to retain and not exercise their stock options upon vesting, which, they argue, led to losses following the decline in the share price of the Debtor's stock. Mindful that the Claimants are uniformly representing themselves *pro se*, the Court does not believe it proper to limit the analysis to the confines of the Stock Option Claims as specifically pled. Rather, given the shared factual pattern and legal principles involved, the Court will treat the Stock Option Claims as a single class of claims and analyze the various arguments that can be made on behalf of that class. It will be necessary at points to distinguish the various claims on specific grounds, which instances the Court will clearly identify, but in general, the following analysis should be read as equally applicable to all the Stock Option Claims.

*General Principles*

█ A preliminary issue that must be addressed is whether a "security" as that term is used in section 510(b) is implicated in the Stock Option Claims. To a certain extent, this question is intertwined with the interpretation of section 510(b)'s

---

7. The Court reaches no conclusions regarding these underlying causes of action. In particular, nothing in this Opinion should be read as concluding that the Claimants have asserted valid causes of action under federal securities law or state common law, or any other body of law that could give rise to a cause of action for fraud.

8. The Court notes that, as would be expected with *pro se* claimants, the Stock Option

Claimants have not, for the most part, clearly delineated and labeled the causes of action upon which they rest their claims. Rather, most of the Claimants have provided the Court with general narratives describing their losses and explaining why they believe the Debtor is liable for such losses. A certain amount of ambiguity necessarily results, which this Court can address only through abstraction.

scope—i.e., the meaning of the phrase "arising from"—as a security could be not directly implicated but nonetheless still sufficiently related for the purposes of the section. At this point, however, the issue can be simply framed as whether a stock option constitutes a "security of the debtor," and to this question the Bankruptcy Code provides an immediate answer. Section 101(49)(A)(xv) defines a "security" as including a "warrant or right to subscribe to or purchase or sell, a security," and as section 101(49)(A)(ii) makes plain, a stock is a security. 11 U.S.C. § 101(49)(A)(ii), (xv) (2006). Therefore, the Bankruptcy Code is clear that a stock option is a "security" as that term is used in section 510(b). As will be discussed later, additional analysis may be necessary to reconcile specific factual issues, but it is sufficient to note at this point the Court's conclusion that a stock option is a "security" under the Bankruptcy Code.

*Fraudulent Inducement*

■ With this in mind, the Court can address the claim for fraudulent inducement to purchase a security. Stated simply, the Claimants argue that the Debtor fraudulently induced them to elect to receive stock options as part of their compensation packages. For example, the claimant William Travers states, "Had claimant known the true state of Enron's finances, these amounts [the total bonuses received in the form of stock options over a two year period] would not have been deferred [i.e., would not have been taken in the form of stock options] but would have been received in a payroll check." Response/Objection to Objection and Relief Claimed in Debtor's Twenty–Second Objection, Docket No. 15262, ¶ 3. Similarly, the claimant David L. Johnson alludes to the fact that the Debtor's officers advised employees "to continue to accept and hold this compensation in the form offered, stock and options." Objection to Debtor's Nineteenth Omnibus Objection, Docket No. 15630, ¶ 2. The Claimants allege, therefore, that but for the Debtor's issuance of fraudulent information, they would not have elected to receive stock options.

This is clearly a claim for damages. The Claimants are not seeking rescission of the stock option grants, which would not likely be available even if sought, nor have the Claimants alleged that the Debtor did not issue the stock options. Equally as clear, this claim for damages is directly related to a securities transaction; that is, there is no causal ambiguity. Where the asserted damages arise directly out of the purchase of the security, whether from the transaction itself or the subsequent transfer, the courts have uniformly held that section 510(b) applies. *See, e.g., In re Stirling Homex Corp.*, 579 F.2d 206 (2d Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979) (concluding that claims filed by "persons who were allegedly induced by fraud to purchase [the Debtor's] stock" should be subordinated). In most respects then, this is a clear example of a typical claim by the defrauded purchaser of a security to which section 510(b) unambiguously applies.

The only particular difficulty here concerns the statutory use of the word "purchase" in section 510(b). The Claimants assert that they did not purchase the stock options at issue, but rather received them as part of an employee compensation package. In common parlance this would most likely be described as a "grant" and not a "purchase." However, the Court concludes that this is an unduly formalistic reading of the provision and that this linguistic inconsistency is not legally relevant. *See Frankum v. Int'l Wireless Communications Holdings, Inc. (In re Int'l Wireless Communications Holdings, Inc.)*, 279 B.R. 463 (D.Del.2002) ("That Appellants re-

ceived the Debtors' stock as part of a compensation package does not preclude the transfer from being characterized as a purchase/sale of the Debtors' stock.") (citing *In re Baldwin–United Corp.*, 52 B.R. 539, 540, n. 1 (Bankr.S.D.Ohio 1985)). *But cf. Transcontinental Realty Investors, Inc. v. Gotham Partners, L.P.*, 218 F.Supp.2d 415 (S.D.N.Y.2002) (holding that a factual issue existed as to whether the exercise of an option to sell stock is a "sale" under section 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p(b) (2006), but also highlighting the unique factual pattern before the court and the court's impression that the action was inequitable and abusive).

While it is true that the Claimants did not purchase the stock options on the open market, they nonetheless exchanged value for the options: here, their labor. Such exchange falls under a broad reading of the term "purchase." Moreover, the Court is unwilling to adopt an interpretation that would include an employee who received cash compensation first and immediately purchased options from the employer, but would exclude an employee who simply chose to receive the options directly as compensation. There appears no logical or tenable distinction between these situations relative to the statute that the Court can recognize. Finally, the Court notes that stock options are specifically included within the definition of securities provided in section 101(49)(A)(xv), listed among fourteen other defined forms of securities. This suggests that the Court should read "purchase" relative to the listed securities, rather than read the listed stock option class subject to a "purchase" proviso. Therefore, the Court concludes that claims alleging the fraudulently induced election of stock options as part of a compensation package are claims "arising from" the purchase of a security and should thus be subordinated pursuant to section 510(b).

■ Some of the Claimants assert a related claim but highlight a key factual difference. These claimants argue that they never elected to receive stock options, but rather were required to take a minimum percentage of their annual bonus in stock option form. This factual distinction, these Claimants argue, demonstrates clearly that they did not "purchase" stock options, as there was no voluntary exchange of goods, services, or currency for the options. While this argument might appear at first blush intuitively reasonable, the distinction is flawed. Although implicit, there is nonetheless a bargain and exchange of value. Here, the exchange is made not at the time of payment but prior to employment. If these Claimants were required to receive a portion of their compensation as options, that was a condition of employment the Claimants willingly accepted in return for their labor. These Claimants, thus, "purchased" the stock options with their labor. Therefore, the Court's previous conclusion is equally applicable to this variation on the above theory.

*Fraudulent Retention*

■ The Claimants also assert a related, but distinct claim for fraudulent retention or maintenance of a security. The Claimants allege that the Debtor's fraudulent information and financial reporting induced them to hold on to and not exercise their options, resulting in significant losses when the share price declined. The claimant James Armogida states, "[A]s a result [of the Debtor's fraudulent financial information] Respondent did not exercise his stock options." Response and Objection to a Part of the Debtors' Thirteenth Omnibus Objection, Docket No. 13817, ¶ 4.

Fraudulent retention claims are not as easily addressed under section 510(b) as claims of fraudulent inducement. Whereas the phrase "arising from" unambiguously describes the claims of defrauded purchasers, the same cannot immediately be said of fraudulent retention claims. The key issue is the temporal and conceptual discontinuity between the purchase of the security and the fraudulently induced retention. These are two separate, if not necessarily distinct, acts, and the alleged injury is necessarily the direct result of the retention, not the purchase. Nonetheless, the use of the phrase "arising from" suggests that the injury need not directly result from the purchase, although as the Third Circuit noted in *Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup )*, "there must obviously be some nexus or causal relationship between the claim and the [purchase] of the security. . . ." 281 F.3d 133, 138 (3d Cir.2002). The question the Court must resolve then is whether the nexus between the purchase and the fraudulently induced retention is too attenuated to justify subordination of the Stock Option Claims pursuant to section 510(b).

The Claimants offer both textual and policy arguments to support their contention that the requisite nexus is not present here. Textually, the Claimants argue that the phrase "arising from" should be read in light of similar federal statutes concerning securities, such as the Federal Securities Act of 1933, 15 U.S.C. § 77a et seq. (2006), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (2006) (collectively, the "Securities Acts"). In particular, the Claimants argue that the phrase "arising from" should be read relative to the phrase "in connection with" as used in section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (2006) and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. *See also In re Granite Partners, L.P.*, 208 B.R. 332, 341–42 (Bankr.S.D.N.Y.1997) (discussing investors' argument comparing section 510(b), section 10(b), and Rule 10b–5); Robert J. Stark, *Reexamining the Subordination of Investor Fraud Claims in Bankruptcy: A Critical Study of In re Granite Partners, L.P.*, 72 Am. Bankr.L.J. 497 (1998) (arguing on the basis of the text and its legislative history that section 510(b) does not apply to fraudulent retention claims). Pursuant to those provisions, the Claimants note, defrauded securityholders may not bring fraudulent retention claims, as such claims are not "in connection with" the purchase or sale of a security. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–738, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) ("Three principal classes of potential plaintiffs are presently barred. . . . Second are actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rose representation or a failure to disclose unfavorable material.").[9] *See also Zaro v. Mason*, 658 F.Supp. 222, 226–7 (S.D.N.Y.1987) ("As a threshold matter then, plaintiffs must allege that the fraud was committed prior to or contemporaneous with the transaction such that it induced the plaintiffs to purchase interests in [the company]."); *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1227 (S.D.N.Y.1982) (" 'Mere retention' of securities during a period of an alleged violation does not satisfy the requirement that the violation be in connection with the

---

9. It appears that courts have generally used the term "shareholders," and to a lesser extent, "stockholders," to mean both holders of stock specifically and holders of any security generally. Citations to other court opinions should be read in light of this. This Court will use the term "securityholder" to refer to the general class of those holding securities as defined in section 101(49)(A) of the Bankruptcy Code.

purchase or sale of a security."). *But cf. Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 710 (2d Cir.1980), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469, L.Ed.2d 469 (1980) (holding that where a continuing fraud induces both purchase and retention of a security, a retention claim may be brought under section 10(b) and Rule 10b–5). Reasoning by analogy, the Claimants argue that the phrase "arising from" similarly does not embrace fraudulent retention claims.

The Claimants also make a more nuanced argument. The Claimants begin with the proposition that the phrase "in connection with" was intended to be read broadly, and indeed, has been read broadly by courts interpreting the Securities Acts. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968) (reviewing the legislative history of section 10(b) of the Securities Exchange Act and noting that "the section as enacted did not in any way limit the broad scope of the 'in connection with' phrase."). The Claimants then note that even under this broad standard, courts have determined that section 10(b) and Rule 10b–5 do not apply to fraudulent retention claims. Finally, the Claimants suggest that the phrase "in connection with" is at least as broad, if not broader than the phrase "arising from" and conclude that section 510(b) should similarly be interpreted to exclude fraudulent retention claims from its purview.

A number of courts in recent years have confronted the application of section 510(b) to fraudulent retention claims. Those courts began their analysis by asking whether the statutory text is ambiguous on its face or as applied. *See Patterson v. Shumate,* 504 U.S. 753, 759, 112 S.Ct.

2242, 119 L.Ed.2d 519 (1992) (statutes must be enforced according to their terms); *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (statutes should be applied according to their terms except where such application produces "a result demonstrably at odds with the intentions of its drafters"); *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.),* 920 F.2d 183, 185 (2d Cir.1990). With one exception, those courts held that section 510(b) was ambiguous as to fraudulent retention claims and then proceeded to analyze the drafter's intent. *See, e.g., Allen v. Geneva Steel Co. (In re Geneva Steel),* 281 F.3d 1173, 1179 (10th Cir.2002) ("We conclude, at least with respect to fraudulent retention claims like [the Claimant's], that the language of section 510(b) is ambiguous."); *In re Granite Partners, L.P.,* 208 B.R. 332, 338–339 (Bankr.S.D.N.Y.1997) ("Initially, the phrase 'arising from the purchase or sale' is ambiguous, at least with respect to fraudulent maintenance claims."). That exception can be found in *In re WorldCom,* where the court held that section 510(b) unambiguously applies to fraudulent retention claims. 329 B.R. 10, 15–16 (Bankr. S.D.N.Y.2005).[10] However, the different approaches espoused by these courts had no substantive consequences, as the *Geneva Steel, WorldCom,* and *Granite Partners* courts all held that fraudulent retention claims should be subordinated pursuant to section 510(b).

Similarly, the majority of courts in recent years that have confronted related issues concerning the scope of section 510(b) have concluded that the phrase "arising from" should be read broadly to

---

**10.** Although this Court currently presides over the WorldCom bankruptcy cases and most of their related proceedings, the WorldCom opinion referenced here and throughout

this Opinion was issued by the Honorable Adlai S. Hardin, United States Bankruptcy Judge for the Southern District of New York.

encompass claims, such as claims for breach of contract, even more indirectly related to the purchase or sale of a security. The courts have also concluded that the requisite purchase or sale need not directly involve the claimant himself. *See, e.g., Telegroup,* 281 F.3d at 144 (holding that section 510(b) applies to claims for breach of stock purchase agreement requiring issuer to use its best efforts to register its stock); *American Broadcasting Systems, Inc. v. Nugent (In re Betacom of Phoenix, Inc.),* 240 F.3d 823 (9th Cir.2001) (subordinating shareholder claims against acquiring company for breach of merger agreement that did not close); *Weissmann v. Pre–Press Graphics Co., Inc. (In re Pre–Press Graphics, Inc.),* 307 B.R. 65 (N.D.Ill.2004) (holding that claim based on state court judgment in favor of minority shareholder for shareholder oppression should be subordinated even though "oppressive" stock sale was to third party); *Int'l Wireless,* 279 B.R. at 463 (holding that claim for breach of stock purchase agreement requiring issuer to make public offering should be subordinated); *In re PT–1 Communications, Inc.,* 304 B.R. 601 (Bankr.E.D.N.Y.2004) (holding that claim based on state court judgment in favor of one shareholder against another for tortious interference with the injured shareholder's ownership interest should be subordinated even though injured shareholder did not participate in the injurious sale); *In re NAL Financial Group, Inc.,* 237 B.R. 225 (Bankr.S.D.Fla. 1999) (concluding that section 510(b) applied to claim for breach of securities purchase agreement requiring issuer to register debentures).

There are few exceptions to this general trend. The Claimants cite *Limited Partners Committee of Amarex, Inc. v. Official Trade Creditors' Committee of Amarex, Inc. (In re Amarex, Inc.),* 78 B.R. 605 (W.D.Okla.1987), and *In re Angeles Corp.,* 177 B.R. 920 (Bankr.C.D.Cal.1995), *aff'd without op.,* 199 B.R. 220 (9th Cir. BAP 1996), in support of their arguments. Neither case presented claims of fraudulent retention. Rather both involved tort and contract claims asserted by limited partners against the general partner and manager of the partnership. While recognizing that section 510(b) required the subordination of claims alleging fraud in the issuance of securities, both courts held that tort and fraud claims against the general partner for post-issuance conduct did not fall within the scope of the section. That is, these courts concluded that the causal relationship between the purchase of the security and the allegedly fraudulent acts was too attenuated. As the *Amarex* court reasoned, "Section 510(b) reveals a Congressional desire to shift to shareholders the risk of fraud in the *issuance* and *sale* of a security—no more." 78 B.R. at 609–10 (emphasis in original). The court in *Angeles* similarly concluded that the claimants "suffered damage 'arising from' the independent *intervening torts* of negligent management, breach of fiduciary duty." 177 B.R. at 927 (emphasis in original). The *Angeles* court further noted that shareholders or limited partners should not bear the risk of fraudulent post-issuance conduct simply by reason of being securityholders. 177 B.R. at 928.

In light of the recent trend in the case law cited above, it is questionable whether *Amarex* and *Angeles* can still be considered good law. More recent cases have uniformly rejected the restricted reading of section 510(b) embraced in *Amarex* and *Angeles,* distinguishing the holdings on factual grounds while also explicitly disagreeing with the legal principles upon which those holdings rested. *See, e.g., Int'l Wireless,* 279 B.R. at 469 n. 2 ("Further, the validity of *Amarex* and *Angeles*

in this circuit is suspect given the Third Circuit's approach to this issue in *Telegroup*."); *Pre–Press,* 307 B.R. at 76 ("The statutory interpretation set forth in [*Amarex* and *Angeles* ] has been called into doubt by recent decisions from the Third, Ninth, and Tenth Circuits."); *Granite Partners,* 208 B.R. at 342–343 ("Finally, the two cases upon which the UIC rely [*Amarex* and *Angeles*] are distinguishable, and in any event, not persuasive."). Moreover, the Tenth and Ninth Circuits have issued more recent rulings that directly conflict with the general holdings of *Amarex* and *Angeles,* even if those holdings are still good law with respect to the limited issue of applying section 510(b) to the claims of limited partners.[11] In *Betacom,* the Ninth Circuit held that section 510(b) embraces breach of contract claims in addition to securities claims, a holding that eviscerates the logic of *Angeles* even if the *Betacom* court did not address that case directly. 240 F.3d at 829. Similarly, the Tenth Circuit in *Geneva Steel* described the *Amarex* court's interpretation of section 510(b) as mistaken, characterizing it as resting on "a small but significant error in reading the statutory language." 281 F.3d at 1173. While this Court questions whether the *Amarex* holding can be ascribed to an inadvertent error, it is clear that the *Amarex* court's strict interpretation of section 510(b) is scarcely viable following the Tenth Circuit's pronouncements in *Geneva Steel.*

The Claimants also cite *Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward),* 272 B.R. 836 (Bankr. D.Del.2001), as an example of a more recent decision embracing a limited interpretation of section 510(b). In that decision, the court considered the debtor's conten-

tion that a claim based on a promissory note the claimant received as partial payment for redeemed stock should be subordinated pursuant to 510(b). The debtor in that case, citing *NAL Financial, Granite Partners,* and other cases discussed above, argued that section 510(b) should be interpreted broadly to include the asserted promissory note claim, apparently on the theory that the note "arose from" the sale of a security because the note was payment for redeemed stock. In rejecting this argument, the court held that "absent an allegation of fraud in the purchase, sale or issuance of the debt instrument, § 510(b) does not apply to a claim seeking simple recovery of an unpaid debt due upon a promissory note." *Id.* at 844–45. *See also Official Committee of Unsec. Creds. v. American Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.),* 306 B.R. 778 (Bankr.D.Del.2004) (considering similar claim by former shareholders who had redeemed stock in exchange for promissory note and similarly holding that such claim should not be subordinated under section 510(b)). The *Montgomery Ward* court reasoned that as the claimant had exchanged stock for a debt instrument, the claimant was no longer an equity holder but a creditor, and therefore declined to apply section 510(b). *Id.*

There have been suggestions that *Montgomery Ward* is no longer good law following the Third Circuit's more recent decision in *Telegroup. See Pre–Press,* 307 B.R. at 78. *See also American Wagering, Inc. v. Racusin (In re American Wagering, Inc.),* 326 B.R. 449, 456 (9th Cir. BAP 2005) (questioning the reasoning of *Mobile Tool* and, by extension, *Montgomery Ward*). *But see Mobile Tool,* 306 B.R. at

---

11. Neither the Ninth Circuit in *Betacom* nor the Tenth Circuit in *Geneva Steel* expressly overruled the lower courts' holdings in *Angeles* or *Amarex,* respectively. The court in *Pre-*

*Press* noted the resulting uncertainty regarding the precedential value of *Amarex* and held that the Tenth Circuit abrogated *Amarex* in *Geneva Steel.* 307 B.R. at 76.

778 (distinguishing *Montgomery Ward* and *Telegroup*).[12] Regardless, however, *Montgomery Ward* provides no support for the claimants here.

The court in *Montgomery Ward* specifically distinguished its holding from the line of decisions cited above holding that section 510(b) applies to fraudulent retention and breach of contract claims, including *Granite Partners* and *NAL Financial. Montgomery Ward*, 272 B.R. at 843–845. As the court noted, "These courts [including *NAL Financial* and *Granite Partners*] are concerned that a restrictive reading of § 510(b) arbitrarily excludes a claim based on fraud related to the purchase or sale of the debtor's securities but not caused by the initial purchase or sale transaction." *Id.* at 844. The *Montgomery Ward* court apparently read those decisions as expressing the principle that where the claimant is a securityholder, section 510(b)

should be read broadly to ensure that functionally similar but formally distinct claims are treated similarly. *See also, United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996) (reviewing "tax" imposed by Internal Revenue Service and holding that the status of a claim is determined by its function and not its label). The court concluded that the corollary to that principle was also true: that where the claimant holds a debt instrument, section 510(b) should be read narrowly to ensure functionally distinct claims are *not* treated similarly. *Id.* at 843.

The court in *Montgomery Ward* noted that "[t]he use of 'damages' in § 510(b) . . . connotes a recovery broader than a simple claim on an unpaid debt." *Id.* at 842. This textual argument is suggestive of a

**12.** This Court believes *Montgomery Ward* is distinguishable from the decisions cited above. As is almost uniformly argued by claimants in section 510(b) controversies, shareholder claims should not be uniformly subordinated for the simple reason that, had Congress desired such a result, it could have easily stated so directly rather than use an indeterminate phrase like "arising from." The Court finds this reasoning persuasive in the abstract, even if it is not relevant here. *See Telegroup*, 281 F.3d at 144, n. 2 ("We agree that in enacting § 510(b), Congress did not intend to subordinate every claim brought by a shareholder, regardless of the nature of the claim."); *Angeles*, 177 B.R. at 927 ("If Congress had wanted to subordinate *all* claims of security holders to an equity position, regardless of the source of the claim, Congress would have [said so].") (emphasis in original). A typical example of such an excluded claim is a personal injury tort claim asserted by a shareholder. In such a case, although there was a purchase of the debtor's security, the tort claim does not "arise from" that purchase, or, as the Third Circuit phrased the concept, "the claim lacks any causal relationship to the purchase or sale of stock." *Telegroup*, 281 F.3d at 144, n. 2. To this Court, the circumstances presented in

*Montgomery Ward* appear to present an example of a claim directly related to the sale of a security, but that nonetheless still does not "arise from" that sale. The Court believes the Third Circuit would find that the "causal relationship" is broken when the shareholder converts his equity interest into a debt instrument like a note and files a claim to merely enforce the debt instrument (presumably, a claim for fraudulent inducement to sell or fraud in the sale would nonetheless still be subordinated even though the claimant now holds a debt instrument). This, however, is a conclusion that rests primarily on policy, not textual, grounds. The text of section 510(b) makes no explicit distinction between the claims of creditors and the claims of securityholders. That is, the statute does not distinguish claims on the basis of the interest the claim represents. Such a distinction can be implied from the operation of the section and the policy considerations motivating it, as section 510(b) is aimed at equity interests attempting to elevate their claim, but the plain language of the section does not require such an inference. For that reason, the Court does not assume *Montgomery Ward* remains good law. It is worth noting, in this regard, the possible tension between the text as written and the policy judgments motivating 510(b).

larger concern. As the court further intimated, it was troubled that a broad reading inclusive of the promissory note at issue in *Montgomery Ward* "could lead to the untenable result that any claim based on default of a corporate bond or debenture is automatically subordinated to the claims of other unsecured creditors given the definition of 'security' in § 101(49)(A)." *Id.* at 844–45. These statements highlight an implicit judgment evident in almost all cases analyzing section 510(b). Though the statutory language refers only to "damages," the courts reasonably read this to mean "damages flowing from changes in the debtor's share price." Where the damages are connected to the declining value of the debtor's stock, the courts are inclined to read section 510(b) broadly for the reason stated in the previous paragraph. Conversely, as the court in *Montgomery Ward* suggested, where the claim is for a fixed amount and does not arise in parallel with the fortunes of the share price, the courts are inclined to read section 510(b) narrowly. The policy justifications for this implicit judgment will be detailed shortly. It is sufficient at this point to note that, first, the Claimants are simply option holders with no plausible claim to creditor status on that basis alone, and second, that unlike in *Montgomery Ward*, the asserted damages here are directly related to the decline in the value of Enron stock. *Montgomery Ward* is for those reasons distinguishable from the instant case.

■ Recognizing then, the weight of precedent favoring the subordination of fraudulent retention claims, and the absence of persuasive precedent upholding the contrary position, the ambiguity *vel non* of the statutory text is ultimately irrelevant. This Court agrees with the *WorldCom* court that:

From the perspective of section 510(b), it makes no difference whether the stockholder's loss in the value of his stock was caused by a pre-purchase fraud which induced his purchase, or a post-purchase fraud, embezzlement, looting, or other corporate misconduct which undermined the value of his stock. In either case, the stockholder's loss represented by diminution in or destruction of the value of his stock ultimately constitutes a claim for damages derived from his ownership of stock and therefore "arising" from his purchase of the stock, whether the stockholder retained his stock or sold it.

329 B.R. at 15–16. *See also Granite Partners,* 208 B.R. at 342 ("[T]here is no good reason to distinguish between allocating the risks of fraud in the purchase of a security and the post-investment fraud that adversely affects the ability to sell (or hold) the investment...."). *But see* Stark, 72 Am. Bankr.L.J. at 497 (arguing on the basis of the text and its legislative history that section 510(b) does not apply to fraudulent retention claims). The Claimants have not offered, nor has the Court discovered elsewhere, a cogent argument that would justifiably distinguish between fraudulent inducement and fraudulent retention claims for the purposes of section 510(b). As just suggested, these are functionally, even if not formally, identical claims that both arise in connection with the performance of the Debtor's stock. In light of this, the hazy boundaries of the phrase "arising from" are insufficient alone to convince this Court that section 510(b) is ambiguous as applied to fraudulent retention claims.

However, even assuming that section 510(b) was so ambiguous, consideration of the case law and policy concerns underpinning section 510(b) warrants the conclusion that fraudulent retention claims "arise from" the purchase of a security. As al-

ready noted, not only have three courts previously held specifically that section 510(b) applies to fraudulent retention claims, but even more, the clear trend in the case law is to interpret section 510(b) broadly to include, for example, breach of contract claims. Arguably, the latter cases, such as *Betacom* and *Telegroup*, embrace an even broader conception of section 510(b) than that necessary to resolve the issue here. In both *Betacom* and *Telegroup* the claimants asserted claims founded on the relationship between contracting parties, not that between securities issuer and holder. In contrast here, securities law is the source of the parties' obligations and the sole issue is the temporal and conceptual discontinuity between the purchase of the securities and the alleged fraudulent acts. While the Court agrees with the reasoning and result of those cases, it is not necessary in the instant matter to interpret section 510(b) as broadly as those courts did in order to find that section 510(b) is applicable here.

■ The near unanimity in the case law reflects the recognition that the policy considerations motivating section 510(b) are apply equally to fraudulent retention claims. The Second Circuit cautioned, "When a corporation becomes bankrupt, the temptation to lay aside the garb of a shareholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion." *Stirling Homex,* 579 F.2d at 213. The reason for such caution, and the policy judgment behind section 510(b), is clear: "Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." *Telegroup,* 281 F.3d at 142. Equity favors general creditors rather than the allegedly defrauded securityholders in bankruptcy for the simple reason that, inasmuch as the securityholder enjoys the benefits of share price gains, he should also bear the burden of insolvency, whether such insolvency is the result of fraud or not. As the court stated in *Telegroup,* "[B]ecause claimants retained the right to participate in corporate profits if Telegroup succeeded, we believe that § 510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors." *Telegroup,* 281 F.3d at 142. *See also WorldCom,* 329 B.R. at 14 ("But the plain fact is that all of these debacles happened, and when the [claimants] purchased their stock, that is exactly what they 'subscribed' to, just like all the other disappointed investors in this or any other era of capitalism."). The courts in *Granite Partners, WorldCom,* and *Geneva Steel* concluded that these same policy concerns were implicated by fraudulent retention claims, and this Court concurs.

In light of these considerations, the Court does not find the Claimants' textual arguments persuasive. Whether or not comparative statutory analyses are valuable in other contexts, a comparative analysis of Rule 10(b)–5 and the Securities Acts does not appear fruitful here.[13] The

---

13. The Claimants have raised an issue concerning the *Granite Partners* court's reliance on *ABF Capital Management v. Askin Capital Management,* 957 F.Supp. 1308 (S.D.N.Y. 1997) to inform its interpretation of section 510(b). In *ABF Capital,* the district court held that fraudulent retention claims could not form the basis for a RICO action as such claims would be actionable under securities laws. This conclusion was questioned in *Mezzonen, S.A. v. Wright,* 1999 WL 1037866, 1999 U.S. Dist. Lexis 17625 (S.D.N.Y. Nov. 16, 1999), where the court held that such claims could be the predicate act as they were in fact

phrases "in connection with" and "arising from" are clearly different, and as noted in *Granite Partners*, the Court is "not so linguistically adept that [it] can agree that one is plainly broader than the other." Moreover, there is nothing to suggest that the Securities Acts and section 510(b) were intended to constitute a complementary whole. A contradictory result does not ensue if one reads Rule 10(b)–5 as excluding fraudulent retention claims while also reading section 510(b) as including such claims; the Bankruptcy Code and the Securities Acts create two distinct regulatory schemes. This is not to say that there could be no reason to harmonize these two statutes, only that there is no evidence that such harmony was intended or required here.

Finally, the Court is not persuaded that a provision such as section 510(b) that plainly incorporates a broad standard should be subjected to a detailed and rigorous textual analysis. *But see* Stark. 752 Am.Bankr.L.J. at 497. In these situations, such analysis has a tendency to miss the forest for the trees. Distinctions between possible and actual word choices, or analysis of the textual construction and word placement, are of minimal independent value, particularly where alternative analyses at the same level of specificity produce contrary conclusions.[14] This is to say nothing of the dilemma introduced when the Supreme Court's interpretation of congressional intent in its use of the phrase

"in connection with" is posited as "correct" in a way binding upon Congress itself in its use of similar but distinct phrases.

Therefore, the Court concludes that claims alleging fraudulent retention of a stock option "arise from" the purchase of that security and should be subordinated pursuant to section 510(b).

*Breach of Contract*

The final claim to be addressed by the Court is essentially a claim for breach of contract. As the claimant Manuel Garcia framed his claim, "My claim is not based on a security that lost value. My claim is based on Enron['s failure] to fulfill its commitment ... to the bonuses to which I am entitled." Response to Debtors' Eighteenth Omnibus Objection to Proofs of Claim, Docket No. 17843, pg. 2. The Claimants' legal arguments are not detailed, but may be assumed to consist in essence of the following propositions: first, the Debtor was obliged by contract to the Claimants for a certain amount; second, the Debtor attempted to meet this obligation by granting the Claimants stock options, representing those options to have a certain value; third, the stock options either did not or would not have that value; and fourth, the contractual obligation was therefore not satisfied and was breached following the Debtor's attempt to perform. The Claimants therefore assert that the Stock Option Claims should not be subordinated as they arise from this contractual

barred under securities laws. This Court does not believe, however, the court's conclusion in *Granite Partners* regarding RICO and securities law was necessary to that court's conclusion regarding section 510(b), and this Court does not rely on that discussion to inform its own conclusion.

14. For example, Stark and others suggest that Congress could have and would have used an alternative formulation if it intended to *include* fraudulent retention claims within the

scope of section 510(b). However, this only begs the question. It could be argued conversely that Congress, drafting section 510(b) barely two years after the Supreme Court's decision in *Blue Chip Stamp*, would have used the phrase "in connection with" if it intended to *exclude* fraudulent retention claims, and that the use of an alternative phrase demonstrates that Congress did not have that intention. Clearly, such arguments are speculative at best here.

obligation and not any decline in value of the Debtor's stock.[15]

This claim raises a number of issues that the Claimants do not address. First, the Claimants do not detail their method for valuing the stock options. The Court presumes that the Claimants are arguing that the stock options should have more accurately reflected the true state of the Debtor's finances and financial future. The Court presumes as well that the Claimants are asserting that the stock options are currently worthless because they may not be exercised. Clearly, the value of stock options as payment on an obligation must relate in some fashion to the probability that the options may be exercised upon vesting. However, the Claimants have not elaborated on the nature of this relationship. The Claimants have not alleged that the process the Debtor used to value the stock options, i.e. the formula used to compute the quantity and price of the optioned stock, was fraudulent. Therefore, their claim must rest on the inputs used, that is, the assumptions made about the future price of the stock based upon then-current financial information. The Court notes that the claim, from that perspective, implicitly posits a certainty to future share price that is contrary to both practice and theory.[16]

Similarly, the Claimants do not explain the relevant points in time at which the value of the obligation and the consideration should be compared. It is not clear whether the Claimants are arguing that the stock options were always overvalued or only became overvalued at some later point as a result of the Debtor's further actions. The Claimants appear to implicitly assume that, at the time the option was granted, it was certain that the stock price would decrease in the future and that the Debtor knew of this fact. The Court notes simply that as an evidentiary matter the Claimants would find it difficult to meet their burden of proof on such a claim. If the Claimants do not, therefore, assert that the stock options were always overvalued, it is not clear how consideration accepted for value becomes inadequate compensation at a later point, nor how such a transition could affect the prior satisfaction of the debt.

Finally, the Claimants do not distinguish their claims from the claims of any employee of any employer who is unable to exercise his stock options because the share price has declined. According to the Claimants' argument as stated, it would appear that an employer fails to satisfy its contractual obligations regarding compensation whenever employee stock options have a higher exercise price than the contemporary share price. The Court assumes the Claimants do not intend to make this sweeping argument. The question then becomes on what grounds can these two situations be distinguished. The Claimants have certainly made allegations of fraud, but the breach of contract claim is not dependent on such fraud, and in fact,

---

15. The Court notes that some of the Claimants hold options that were granted pursuant to the Enron Corp. Bonus Plan while other Claimants hold options received under an employment contract. Though the Court has not attempted to separate these two groups for the purposes of its discussion, it should be noted that the breach of contract claim brought by those Claimants who hold bonus stock options would have to be anchored in an enforceable obligation.

16. This assumption concerning future performance and value, and the complementary concept of risk, is one of the primary issues raised by the Claimants. It will be discussed in more detail shortly, but it is sufficient at this point to note that the Claimants' breach of contract claim brings it to the fore and that the Claimants have not fully addressed these concepts and their consequences here.

allegations of fraud add little to a breach of contract claim other than as details of the breach.

The Court notes a number of additional issues are raised by the Claimants' arguments. For example, if the Court was to allow this breach of contract claim on the merits, the Claimants' arguments might be extended so as to argue that the Court should reexamine every transaction in which the Debtor either offered or received as payment stock options or convertible debt instruments. It is sufficient at this point to note that the Court is unsure whether the Claimants have even stated a cognizable breach of contract claim. While the Court must read a *pro se* litigant's complaint broadly to assert the best possible arguments that could be made, there are limits to the Court's ability to construct proper legal arguments here.

 The Court need not address these substantive issues, however. Rather, the only issue before the Court is whether, assuming the breach of contract claim succeeds on the merits, that claim should nonetheless be subordinated under section 510(b). The Court concludes that it should.

 That the claim is for breach of contract is not sufficient alone to prevent subordination. As noted previously, a number of courts have held that breach of contract claims may be subordinated under section 510(b) where there exists "some nexus or causal relationship between the claims and the purchase of the securities...." *Telegroup*, 281 F.3d at 138. *See also Betacom*, 240 F.3d at 829 (subordinating breach of contract "claims for damages surrounding the sale or purchase of a secu-

rity of the debtor"); *Frankum v. Int'l Wireless Communications Holdings (In re Int'l Wireless Communications Holdings)*, 257 B.R. 739 (Bankr.D.Del.2001), *aff'd* 279 B.R. at 463; *NAL Financial*, 237 B.R. at 234 (subordinating breach of contract claim because "[the claimant] would not have these causes of action against [the debtor] had the parties not entered into [the security purchase agreements]"). Although these standards are imprecise and simply restate to a great extent the causal ambiguity of the phrase "arising from," the opinions make clear that the courts were concerned with a particular set of breach of contract claims: namely, those breach of contract claims that merely recharacterize and restate subordinated securities claims.

The courts referenced above rooted their conclusions in analyses of the relevant statutory text, legislative history, and policy concerns, which rationales this Court adopts as well. *See, e.g., NAL Financial*, 237 B.R. at 231–234 (discussing case law, legislative history, and public policy). However, this Court also reiterates the functional analysis previously discussed in connection with the asserted fraudulent retention claims. As was noted, section 510(b) is intended to prevent shareholders and other securityholders from bootstrapping their equity interests to a level on par with general creditors and thus sharing equally in the distribution of the bankrupt estate.[17] *See, e.g., In re Wyeth Co.*, 134 B.R. 920, 921 (Bankr. W.D.Mo.1991) (Congress was concerned "that an equity holder could elevate his claim to that of an unsecured creditor through a claim for rescission of his purchase of the debtor's securities or a tort claim for damages arising out of his purchase of the debtor's securities....").

---

**17.** As a Congressional judgment, this principle need not be defended or justified here. However, for a contrary view, see Kenneth B. Davis, Jr., *The Status of Defrauded Securityholders in Corporate Bankruptcy*, 1983 Duke L.J. 1.

The same concern is implicated by recharacterized breach of contract claims. In such cases, the claimant is also seeking to elevate his equity interest, but has simply relocated the source of the obligation in order to avoid the application of section 510(b). Clearly, if the courts are commanded to rebuff securities claims seeking treatment on par with general creditors, a functional analysis similarly requires the courts to rebuff securityholders asserting breach of contract claims. The court in *Telegroup* hinted at this pragmatic consideration when it stated, "[W]e see no reason as a matter of policy why a fraud claim against Telegroup for misrepresenting to buyers that it was using its best efforts to register its stock should be subordinated under § 510(b), but a contract claim against Telegroup for breaching its agreement to use its best efforts to register its stock should not." 281 F.3d at 143. Similarly, the bankruptcy court in *Int'l Wireless* noted, "Many claims of 'defrauded' shareholders could be characterized as either [breach of contract or tort claims]. Were we to limit the applicability of section 510(b) to tort claims, shareholders could easily avoid its effect by asserting that a debtor's fraudulent conduct in the sale of its securities was a breach of the sales contract." 257 B.R. at 746.

■ The question then is whether the instant breach of contract claim is merely a recharacterized securities claim. That is, if the subordinated securities claim and the breach of contract claim relate to the same transaction and describe the same pattern of events and facts, but differ only in the source of the obligation, duty, or right, then the breach of contract claim will be subordinated. Such is the case here. As the Claimants' essential complaint is that the Debtor fraudulently misrepresented the value of the stock options it offered as compensation, this breach of contract claim is simply a disguised claim of fraud in the issuance. Such fraud claims are clearly subject to subordination under section 510(b). *See Telegroup*, 281 F.3d at 140 ("[W]e thus agree with claimants that claims alleging illegality in the issuance of securities fall squarely within the intended scope of § 510(b).")

Therefore, the Court concludes that claims for breach of contract related to stock options are claims "arising from" the purchase of a security and should be subordinated where the breach of contract claim is a recharacterized subordinated securities claim, such that the breach of contract and securities claim relate to the same transaction and describe the same pattern of events and facts, but differ only in the source of the obligation, duty, or right.

*Phantom Stock*

■ Claim # 654600, filed by Lee H. Sheldon, is sufficiently distinct factually so as to require separate treatment.[18] Mr. Sheldon asserts that he purchased $2,400 worth of "phantom stock" shares as part of his compensation package. Such stock differs from the typical general class of stock in that delivery of the shares is deferred for tax purposes. Mr. Sheldon argues that his ownership vested on November 10, 2001, approximately three weeks before the Petition Date, and that the Debtor refused to deliver ownership of the shares on that date or afterwards. Mr. Sheldon therefore filed a proof of claim in this Court in the amount of $2,400, corresponding to the value of the phantom stock shares he purchased. In addition, it appears from a letter attached as an exhibit

---

**18.** Mr. Sheldon filed two claims, # 654500 and # 654600. Claim # 654500 is related to employee stock options and was addressed in the previous discussion. Claim # 654600 is related to phantom stock and is addressed separately here.

to Mr. Sheldon's proof of claim that the Debtor acknowledged its failure to deliver the shares, stated that it would never do so, and advised Mr. Sheldon that the bankruptcy court was the proper venue for relief. Response to Debtor's Nineteenth Omnibus Objection to Proofs of Claim, Docket No. 15416, Ex. B, C.

■ Though it is not clear on what grounds the Debtor refused to deliver these phantom stock shares to Mr. Sheldon, the Court concludes that this claim should be subordinated pursuant to 510(b). *Betacom* is almost directly on point here. 240 F.3d at 828–31. As the *Betacom* court noted, physical possession of the security is not required for a claim based upon that security to be subordinated. *Id.* at 829–30 (citing *In re THC Financial Corp.*, 679 F.2d 784, 787 (9th Cir.1982) (concluding that claim for escrowed stock that had not been delivered should be subordinated)). Even more, whether the cause of action is styled as a breach of contract or securities claim, the claim is "for damages surrounding the sale or purchase of a security of the debtor." *Id.* at 829. *See also Telegroup*, 281 F.3d at 140 ("[W]e thus agree with claimants that claims alleging illegality in the issuance of securities fall squarely within the intended scope of § 510(b)."). Therefore, the Court concludes that claims alleging failure to deliver purchased phantom stock are claims "arising from" the purchase of that phantom stock and should be subordinated pursuant to section 510(b).

V. Additional Considerations

The bulk of the Claimants' brief responses are devoted not to the legal arguments discussed above, but rather to providing a fuller context in which to situate the Stock Option Claims. The Claimants argue that a more realistic appraisal of the environment and the parties' expectations would differentiate these claims from the

typical securities claims subject to section 510(b) subordination. While the Court is sympathetic to these arguments, they clearly bring to the fore policy considerations that are not properly a subject for judicial determination. Nonetheless, the Court believes it worthwhile to detail these considerations in order to highlight the policy and normative judgments at issue here.

The Court has up to this point refrained for the most part from delving deeply into the history and background of section 510(b). With the accumulation of precedents, it is no longer necessary that the courts relate in detail the history of section 510(b) and its logical unity with other principles of bankruptcy law. In this Court's opinion, the broad applicability of section 510(b) is now quite settled. Such an examination is, however, necessary to understand and weigh the Claimants' narrative.

Any discussion of the principles and theories behind section 510(b) is obliged to consider the journal article that motivated the promulgation of the statute, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, by Profs. John J. Slain and Homer Kripke ("Slain and Kripke"). 48 N.Y.U. L.Rev. 261 (1973). In drafting section 510(b), Congress broadly adopted the legal principles articulated by Slain and Kripke. *See* Report of the Committee on the Judiciary, Bankruptcy Law Revision, H.R.Rep. No. 95–595, at 196 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6156–57 (stating that "[t]he bill generally adopts the Slain/Kripke position"); *Id.* at 195 ("The argument for mandatory subordination is best described by Professors Slain and Kripke."). *See also, Telegroup*, 281 F.3d at 139 ("In enacting § 510(b), Congress relied heavily on a law review article writ-

ten by Professors John J. Slain and Homer Kripke...."); *Betacom*, 240 F.3d at 829 ("Congress relied heavily on the analysis of two law professors in crafting the statute."); *Pre–Press*, 307 B.R. at 75 (quoting *Telegroup*); *Granite Partners*, 208 B.R. at 336 ("Any discussion of section 510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke...."). *See also Stirling*, 579 F.2d at 206 (citing Slain and Kripke to support equitable subordination of defrauded shareholders' claims prior to section 510(b) entering into force). *But see* Davis, *The Status of Defrauded Securityholders in Corporate Bankruptcy*, 1983 Duke L.J. at 4–7 (noting that British and American courts have long had to resolve disputes between defrauded securityholders and creditors in bankruptcy proceedings); Stark, *Reexamining the Subordination of Investor Fraud Claims in Bankruptcy*, 72 Am. Bankr.L.J. at 503–504 (noting that prior to the promulgation of 510(b), lower courts followed the Supreme Court's holding in *Oppenheimer v. Harriman Nat'l Bank & Trust Co.*, 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937) and generally treated defrauded securityholders and general creditors equally in bankruptcy).

Congress framed the issue thusly:

A difficult policy question to be resolved in a business bankruptcy concerns the relative status of a security holder who seeks to rescind his purchase of securities or to sue for damages based on such a purchase: Should he be treated as a general unsecured creditor based on his tort claim for rescission, or should his claim be subordinated? H.R.Rep. No. 95–595, at 194, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6154–55.

As every court that has confronted section 510(b) has noted, Slain and Kripke compellingly argued that such claims should be subordinated. They identified in particular two risks that should be borne by securityholders, but which would be shifted at least in part to creditors if defrauded securityholders were allowed to participate on par with general creditors in the distribution of the bankrupt estate: "(1) the risk of business insolvency from whatever cause; and (2) the risk of illegality in securities issuance." Slain and Kripke at 286.

As to the first, Slain and Kripke argued that while it was true that both creditors and securityholders bear the risk of business insolvency, the absolute priority rule reflects the judgment that they bear that risk to different degrees. Slain and Kripke clearly regarded the absolute priority rule as a first principle of bankruptcy law, noting, "Not many doctrines have passed more fully into the collective consciousness of the legal and commercial communities than the absolute priority rule...." *Id.* at 261. In return for the right to share in the profits of a corporation, securityholders must also accept the greatest risk of insolvency and are therefore precluded from sharing in the distribution of the estate until all general creditors have been satisfied. Conversely, general creditors have greater priority in the distribution because they do not share in the profits of a successful enterprise, but rather simply expect repayment of the debt. Securityholders thus accept greater risk in return for the opportunity of a greater reward, whereas general creditors bear less risk commensurate with the fixed nature of their reward. *Id.* at 286. *See also* Elizabeth Warren, *Bankruptcy Protection*, 54 U. Chi. L.Rev. 775, 792 (1987) ("An almost axiomatic principle of business law is that, because equity owners stand to gain the most when a business succeeds, they should absorb the costs of the business's collapse—up to the full amount of their investment.")

Slain and Kripke further note that as a consequence of the absolute priority rule, creditors can rely on securityholders to provide an equity cushion. Simply, creditors regard the securityholders' equity investment in an enterprise as a form of collateral. The equity cushion effectively assures creditors that, in the case of insolvency, at least some assets of the insolvent enterprise will be available to repay the debt to some degree.[19]

Both the absolute priority rule and the resulting concept of an equity cushion create a strong presumption disfavoring the elevation of securityholder claims in a bankruptcy proceeding to a level on par with the claims of general creditors. As Slain and Kripke hint, the question then becomes whether, in light of the debtor's fraud, equity or other legal principles surmount this presumption and support shifting more of the risk of insolvency to creditors; or, in other words, who should bear the risk of illegality. Though they clearly regarded the absolute priority rule as well-nigh inviolable, Slain and Kripke also argued: "It is difficult to conceive of any reason for shifting even a small portion of the risk of illegality from the stockholder, since it is to the stockholder, and not to the creditor, that the stock is offered." *Id.* at 288. They further analogized the standing of the defrauded securityholder to that of a defrauded surety. *Id.* A defrauded surety, they noted, remains liable to innocent creditors, even if he has rights as against the principal. For these reasons,

Slain and Kripke concluded that the absolute priority rule governs even those claims asserted by defrauded securityholder, the position adopted in section 510(b).

The Claimants do not provide a detailed refutation of the Slain and Kripke position, either in general or as applied here. Rather, the Claimants have sketched a narrative detailing the pattern of practices within the company regarding employee stock options and their own expectations. They argue that section 510(b), whatever its applicability elsewhere, should not be applied to employee stock options. In particular, they question whether employee stock options represent or create an equity cushion and highlight the differences between their own expectations and the expectations of a more typical securityholder.

The Court does not agree with the Claimants' argument regarding the equity cushion. It is not clear to the Court whether the optioned stock was to be purchased on the open market or whether the Debtor simply issued new stock when employee stock options vested, but the Court assumes the latter and that the Debtor drew upon Treasury stock to satisfy any exercised stock options. If the Debtor issued new stock, the employee's discounted purchase still represents an equity investment, even though the enterprise would receive a smaller equity investment than if the newly issued stock was sold on the open market. In either case, additional equity is invested in the enterprise, equity upon which a creditor could rely.[20]

---

19. In discussing the equity cushion, Slain and Kripke frame the issue as one of reliance: creditors rely on the equity cushion and therefore their reasonable expectations should not be upset. This led them to conclude that defrauded shareholders should share equally with prior creditors, that is, creditors who did not rely on their equity contribution, for the simple reason that such creditors had extended the enterprise credit before the shareholder invested in the enterprise. Slain and Krip-

ke, 48 N.Y.U. L.R. at 288–291. They similarly concluded that a defrauded shareholder should be able to elevate his claim if he could demonstrate non-reliance by subsequent creditors. However, neither of these positions were incorporated in section 510(b).

20. The Court, nonetheless, questions the utility of the equity cushion concept as a rationale for section 510(b) subordination. The concept is clearly useful in understanding the

However, even assuming that the Claimants are correct regarding the equity cushion, this issue is only one part of the broader judgment concerning risk allocation. The absolute priority rule creates an equity cushion, but it does not rely on that cushion for logical support. In fact, in the absence of an equity cushion, one could argue, contra the Claimants, that subordination of defrauded securityholder claims is even more necessary, as the assets of the estate would presumably be less relative to the number of claimants.

Rather, the issue of risk allocation is more integral to any policy analysis of section 510(b).[21] The absolute priority rule, upon which section 510(b) rests, is a mechanism for allocating risk between creditors and securityholders, and any attempt to carve out an exception to section 510(b) for employee securities claims must address the rationale for the risk status quo. As Slain and Kripke noted, given the primacy of the absolute priority rule, the question the Claimants must answer is simple: What principles and facts justify reallocating the risk of securities fraud from the securityholder alone to both equi-

ty interests and creditors? The Claimants might protest that this formulation is biased in favor of the status quo in that it implicitly downplays the loss and damages suffered by the Claimants in favor of greater attention to the loss creditors would suffer if securityholders were allowed to participate in the distribution. However, as has been succinctly and insightfully noted, "[B]ankruptcy policy becomes a composite of factors that bear on a better answer to the question, 'How shall the losses be distributed?'" Elizabeth Warren, *Bankruptcy Protection*, 54 U. Chi. L.Rev. 775, 777 (1987). The Claimants' losses cannot be viewed in isolation but only in relation to the losses suffered by all interests.

The Claimants' broadest argument questions the characterization of their interests as equity interests. As the claimant Jerry Castleman argues:

> Most employees, if not all, viewed stock awards as a form of cash compensation, [as demonstrated] by the manner in which employees typically exercised their stock awards by receiving cash

absolute priority rule and the distinction between classes of claims, but it is less useful when applied to any particular claim for the simple reason that it is difficult in a mature and liquid market to link any particular equity investment to any particular credit extended in reliance thereon.

21. It is unclear which rationale Slain and Kripke regarded as superior, if these concepts can even be neatly severed. As noted in footnote 18, *supra*, Slain and Kripke proposed that a defrauded securityholder could avoid subordination of her claim under section 510(b) if she could demonstrate the absence of reliance by a creditor. This proposition supports this conclusion that Slain and Kripke regarded the equity cushion as the primary justification for subordination. At the same time, however, Slain and Kripke repeatedly noted the sacredness of the absolute priority rule. Nonetheless, Congress and the courts have clearly elevated the issue of risk to the

fore. As was also noted in footnote 18, section 510(b) does not incorporate two rules proposed by Slain and Kripke, which rules would follow if the equity cushion trumped the absolute priority rule as the primary theoretical justification for the section. Similarly, opinions concerning section 510(b) repeatedly reference the issue of risk and discuss only briefly, if at all, creditor reliance and the equity cushion concept. *See, e.g., Telegroup*, 281 F.3d at 139 ("Slain and Kripke argued that the claims of shareholders ... should generally be subordinated to the claims of general creditors, conceptualizing the issue as one of risk allocation."); *Betacom*, 240 F.3d at 829 (discussing the Slain and Kripke analysis as one concerned with the parties' expectations concerning risk); *Granite Partners*, 208 B.R. at 336 ("[Slain and Kripke's] conclusion flowed from an analysis based upon the allocation of two different types of risk....").

from the exercise of the award. My expectation was that when my awards were exercised (i.e., when the options were vested and exercised), I would receive cash—not an equity interest in the Company. . . .Therefore, I cannot understand why the Debtors and Creditors Committee believe that my claim should be treated differently than other claims such as claims related to Enron's deferred compensation plans, which are treated as unsecured creditors. Additional Response and Objection, Docket No. 17774, pg. 2 (parenthetical added). Similarly, the claimant James Armogida notes:

The Plan under which my Options were granted has a number of provisions which distinguish my Options from Common Stock. The Plan recognized that the Options were a 'compensation arrangement' and that I might receive 'other or additional compensation arrangements.' The expectation of the Plan, and my expectation, was that when my Options were exercised, I would receive money—not an equity interest in the Company (I was to be paid in cash, not stock, in a 'broker financed exercise' set up by the Company as part of the Plan.) If and when I exercised my Options, the Company booked it as ordinary income compensation to me and withheld tax based on the payment I received—just as in my monthly com-

pensation or deferred compensation, when taken.[22] Additional Response and Objection, Docket No. 15602, pg. 3 (parenthetical in original).

The Claimants thus argue that, regardless of the relevant abstract legal concepts, the parties' expectations and the established pattern of practice demonstrate that employee stock option holders are more analogous to creditors than equity interests. This argument is implicitly addressed to the normative calculus in the Slain and Kripke risk allocation analysis. As discussed previously, Slain and Kripke coupled the absolute priority rule, and by extension, section 510(b), to a direct correlation between risk and reward. Though Slain and Kripke did not state as much, this is clearly a normative judgment that those interests able to capture greater rewards should also be allocated the greatest risk. The Claimants do not dispute this general proposition, but rather question the assumption that they, as option holders, are subject to the same normative considerations. They highlight in particular their understanding that employee stock options represented a form of deferred compensation rather than the opportunity to gain an equity interest in the enterprise. Though they do not state so directly, the Claimants also hint that the process for exercising vested stock options was regularized to reflect that understanding, suggesting that the Debtor shared it.

---

**22.** The relevant portions of the Enron Corp. 1994 Stock Plan (the "Plan") to which the claimant refers read:

5.1 (ii) Time and Method of Exercise. Subject to the provisions contained in the Plan and in a Participant's Award Agreement, unexercised vested Shares under an Option may be exercised in whole or in part from time to time by request to the Company. . . . An Option may be exercised through a broker-financed exercise pursuant to the provisions of Regulation T of the Federal Reserve Board.

5.1 (iv) Status as Shareholder. Unless and until a certificate or certificates representing such Shares shall have been issued by the Company to the Participant, the Participant (or the person permitted to exercise an Option in the event of the Participant's death or incapacity) shall not be or have any of the rights or privileges of a Stockholder of the Company with respect to the Shares acquirable upon an exercise of an Option. Enron Corp., 1994 Stock Plan Registration Statement, at exhibit 4.3, pg. 3 (June 30, 1995).

As Slain and Kripke linked their normative risk analysis to the parties' expectations, at least in part, the Claimants' argument is correctly addressed to the relevant issues. However, even setting aside the evidentiary issues engendered—i.e., proof of the employees' pre-petition expectations—this argument raises as many issues as it purports to resolve. In particular, the Claimants assert that they considered the stock options a form of deferred compensation but do not acknowledge the variability of that compensation. Even assuming that the Claimants expected to monetize their options upon vesting, it is still true that the cash value of the options varied with the value of the Debtor's stock. To that extent then, the Claimants would "share" in the profits of the enterprise and resemble a typical equity interest.

The Claimants' expectations argument highlights an implicit assumption evident throughout the Claimants' responses. Simply, while the Claimants do not deny that the value of employee stock options may increase, they assume that there is a minimum value below which such options will not drop. That is, in detailing their expectations, the Claimants appear to evidence the belief that employee stock options do not have substantial negative risk.

It is not difficult to see why this belief arises, even if it is contrary to the nature of the instrument itself. While a financial derivative such as a call or put option is clearly understood to be a contract granting the buyer only the right to buy or sell a commodity or security at a certain price and time, employee stock options are not as evidently a simple contract. Not only are employee stock options described as compensation—thus downplaying the contractual nature of the options—but even more, employee stock options are specifically and intentionally set at below market prices. Thus, while a call option and an employee stock option are formally identical—they both grant the holder the right to purchase at a certain price and time—they are in practice very different instruments for the simple reason that no investor could hope to purchase on the open market a call option with conditions identical to a contemporaneous employee stock option. Employee stock options are specifically designed for the most part to be exercisable, whereas call and put options are universally recognized as conditional, and by extension, risky. This design feature of employee stock options gives rise to the mistaken impressions evidenced here. Because employee stock options are designed to be exercisable in the normal course of business, employees do not recognize that options merely grant them the right to purchase and do not represent a promise to pay a minimum amount equivalent to the product of the number of shares and the strike price.

Nonetheless, these mistaken impressions, however justifiable they may be, do not change the nature of the instrument. Employee stock options are simple "rights" contracts, and while they have a value relative to the demand for that right, they do not have an absolute minimum value intrinsically. They are, then, security instruments. Thus, while the Claimants may have had certain expectations concerning the value of their options, to the extent those expectations were that the characteristic securityholder risks did not apply to them, those expectations are unreasonable.

The Claimants cannot therefore argue that they should not bear the risk of insolvency or securities fraud for the simple reason that, however they might have understood the options they held, employee stock options are securities, and section 510(b) reflects the Congressional judgment

that securityholders should bear the risk of insolvency and securities fraud. This is not to say that the Congressional judgment upon which this Opinion rests is sacrosanct. Setting aside the issue of section 510(b)'s normative validity in general, arguments can be made that employee stock options should be exempted from the normal operation of section 510(b).[23]

However, weighing and balancing competing normative concerns is clearly outside the purview of this Court. The Bankruptcy Code creates a hierarchical and class-structured regime. Unfortunately for the Claimants, as a general principle that regime does not distinguish between claims according to need or equity.[24] Rather, the divisions between classes and the interclass hierarchy are statutorily ordered according to economic interest. The various sections of the Bankruptcy Code spell out in great detail the standards according to which claims are to be organized into classes, and the absolute priority rule as incorporated in the Code rigidly stratifies those classes. Consideration of the normative merits of individual claims is not a component of this priority analysis, except in the limited circumstances where a creditor's claim may be subordinated to other claims of the same class if the creditor is found to have acted inequitably. Stated simply, section 510(b) is not an equitable doctrine and the bankruptcy courts are not courts of chancery.[25]

23. For a critique of the sophisticated shareholder and "unsophisticated" creditor model assumed by the Slain and Kripke analysis, see Davis, *The Status of Defrauded Securityholders in Corporate Bankruptcy*, 1983 Duke L.J. at 9–11.

24. This statement should be qualified. The Bankruptcy Code does not distinguish between claims on the basis of the creditor's "need" or the equities favoring the creditor. The Bankruptcy Code does, however, distinguish between claims in light of the equities disfavoring the creditor, and the judicial "doctrine of necessity" distinguishes between claims according to the debtor's need. Claims may be subordinated for equitable reasons under 11 U.S.C. § 510(c), and debtors often argue that certain claims because of its "needs" should be prioritized to reflect operational and business concerns. Nonetheless, these considerations do not detract from the original point but merely serve to emphasize it. Within the priority hierarchy created by the Bankruptcy Code, there exist in general no grounds upon which to *elevate* a claim on the basis of the needs of the *claimant* or the equities favoring the claim.

25. The Court notes, however, that some have argued that Congress effectively created an exception to the absolute priority rule and the priority regime under the Bankruptcy Code when it enacted the Public Company Accounting Reform and Investor Protection Act of 2002 ("Sarbanes–Oxley"). Pub.L. No. 107– 204, 116 Stat. 745 (2002). The Fair Funds provision of section 308(a) of Sarbanes–Oxley, codified at 15 U.S.C. § 7256(a), allows the SEC to distribute any civil penalties it obtains in an enforcement action for violation of the "securities laws," as defined in 15 U.S.C. § 78c (2006), to the victims of that securities violation. In effect then, under section 308(a) defrauded securityholders such as the Claimants might be able to obtain a recovery for the debtor's securities law violations. Two key arguments have been made against the application of section 308(a) in bankruptcy proceedings. First, it has been argued, this result would conflict with the absolute priority rule and section 510(b) to the extent that any civil penalties awarded the SEC, as a general unsecured claim, resulted in a distribution of estate property to equity interests. Equity then would effectively receive a distribution *pari passu* with general unsecured claims. Second, it has been argued that the SEC claim would be a claim for "penalties" and thus subordinate to general unsecured claims under section 726(a)(4) of the Bankruptcy Code and, in a Chapter 11 proceeding, would violate the "Best Interests of the Creditor" rule as expressed in section 1129(a)(7) of the Bankruptcy Code. Conversely, it has been argued that section 308(a) does not conflict with the Bankruptcy Code and can therefore be applied in bankruptcy proceedings. In furtherance of this conclusion, it is argued that because the SEC undeniably has the authority to assert a claim for civil penalties, and be-

This is not to say that this scheme is necessary or indispensable. What the American bankruptcy regime gains in efficiency and certainty by looking only to objective economic conditions it arguably loses in public legitimacy by prioritizing less "deserving" claims. However, the Court must apply the law as written. Although the Court is sympathetic to the Claimants' position, this is not the proper venue for their arguments. Section 510(b) represents certain Congressional policy judgments that are unquestionably defensible, and no grounds exist for this Court to override those judgments.

## VI. Conclusion

Having reviewed the parties' pleadings and oral arguments, as well as the relevant case law, the Court reaches the following conclusions.

(1) Stock Options are "securities" within the meaning of section 510(b) of the Bankruptcy Code.

(2) Claims for fraudulent inducement to purchase a stock option are claims "arising from" the purchase of a security within the meaning of section 510(b) and should therefore be subordinated.

(3) Claims for fraudulent retention of a stock option are claims "arising from" the purchase of a security within the meaning of section 510(b) and should therefore be subordinated.

(4) Claims for breach of contract related to stock options are claims "arising from" the purchase of a security within the meaning of section 510(b) and should be subordinated where the breach of contract claim is a recharacterized subordinated securities claim, such that the breach of contract and securities claims relate to the same transaction and describe the same pattern of events and facts, but differ only in the source of the obligation, duty, or right.

(5) Claims alleging failure to deliver purchased phantom stock are claims "arising from" the purchase of that phantom stock and should therefore be subordinated pursuant to section 510(b).

Accordingly, the Court concludes that the Stock Option Claims do arise from the purchase or sale of a security and should thus be subordinated pursuant to section 510(b).

Based upon the foregoing, the Objections are GRANTED with respect to the

cause the distribution is made outside the bankruptcy proceeding itself, the SEC is free to distribute the fund in whatever way it sees fit without violating the Bankruptcy Code—that is, the character of the claim is not determined by the use to which the SEC puts the proceeds. Regarding the "best interests" test, it has been argued that 1129(a)(7) is not implicated for factual reasons. If, in a Chapter 11 rehabilitation, the difference between the "going concern value" and the hypothetical Chapter 7 liquidation value is greater than the amount of the asserted "penalties" claim, then, it is argued, section 1129(a)(7) is not implicated—even if the "penalties" claim would be subordinated by the application of section 726(a)(4) in a liquidation.

The Court knows of no case as of yet that has confronted this potential issue directly. The Court does note that this Court in *In re WorldCom, Inc.* and the court in *In re Adelphia Communications Corp.* have held that this issue is fairly litigatable and therefore properly the subject of a settlement under Bankruptcy Rule 9019(a). *In re Adelphia Communications Corp.*, 327 B.R. 143 (Bankr.S.D.N.Y. 2005), *adhered to on rehearing*, 327 B.R. 175 (Bankr.S.D.N.Y.2005), *aff'd sub nom. Ad Hoc Adelphia Trade Claims Committee v. Adelphia Communications Corp.*, 337 B.R. 475 (S.D.N.Y.2006); *In re WorldCom*, Case No. 02–13533(AJG), Docket No. 8125, Ex. A (Bankr.S.D.N.Y. Aug. 6, 2003).

Stock Option Claims. The Debtor should settle an order consistent with this Opinion, and attach a copy thereof, on each of the Claimants.